**N.P. SANDBOTHE and Eugene C. Keeven, Plaintiffs-Appellants,**

v.

**CITY OF OLIVETTE, et al.; Defendants-Respondents.**

No. 45175.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 8, 1983.

---

Albert A. Michenfelder, Clayton, for plaintiffs-appellants.

Shulamith Simon, Husch, Eppenberger, Donohue, Elson, & Cornfeld, St. Louis, for defendants-respondents.

LACKLAND H. BLOOM, Special Judge.

This appeal presents for review an administrative decision of the City of Olivette. Appellants are the owners of approximately 1.62 acres of land situated on the southwest corner of Olive and Dielman Roads in the City of Olivette, St. Louis County, part of which is zoned "F" Commercial and the balance "A/B" residential. Respondents are the City of Olivette, a municipal corporation, the Mayor, and City Council Members. The appeal is from a judgment of the Circuit Court of St. Louis County affirming the action of respondents in granting appellants special use permits to operate a drive-in restaurant on the portion zoned commercial and a parking area on the portion zoned residential, subject to ten conditions two of which appellants challenge on this appeal.

This is the second time this matter has been before this court. In N.P. Sandbothe v. City of Olivette, 599 S.W.2d 38 (Mo.App. 1980), a review was sought of a decision of respondents in denying the application for the special use permits. The case was reversed and remanded with directions to the City Council to either make findings of fact and conclusions of law on the record then before it or after further hearings if it deemed them appropriate.

Upon remand, the City Council directed the City Planning Commission to rehear appellants' application. The hearing was held in July, 1980. Thereafter the Planning Commission recommended approval to the City Council subject to certain conditions including the elimination of the drive-thru facility. A public hearing was held by the Council on February 24, 1981, and the Council made Findings of Fact and Conclusions of Law on March 24, 1981. On April 14, 1981, the City Council enacted Ordinance 1348 granting the special use permits subject to ten conditions as follows:

"Section 2: Said special permits for the location and operation of a restaurant and associated vehicular parking area shall be conditioned on, and shall become and remain in force and effect only under, the following terms and provisions:

(a) The east boundary of the parcel for its entire length shall be landscaped with such planting, trees and shrubs and the installation of berms as shall afford the maximum visual and sound protection.

(b) The 73 foot buffer strip to the south of the parking area shall be landscaped with such plantings, trees and shrubs and with the installation of such berms as shall afford maximum visual and sound protection.

(c) Landscaping shall be provided between the front of the building and Olive Boulevard and along the western boundary of the parcel.

(d) The hours of operation shall not be earlier than 7:00 a.m. and not later than 10:00 p.m. on any day.

(e) The restaurant operator shall police the site and the block around the site (Olive, Dielman, Engel, and Harvest Lane) on both sides of Dielman, Engel Lane, and Harvest Lane, and on the south side of Olive, three times a day and shall remove all litter generated from the restaurant.

(f) The driveways on the Dielman Road side shall be so located as to avoid placing them in direct alignment with the driveways on the east side of Dielman Road.

(g) There shall be no drive-thru facility.

(h) The number of parking spaces shall not be less than 86.

(i) The interior circulation plan shall provide for one-way drives, one-way circulation and angle parking.

(j) The vehicular parking area shall be designed, constructed and maintained in accordance with the ordinance requirements of the City."

Appellants accepted and complied with eight of the conditions and challenge only conditions 2(d) and (g). McDonald's restaurant had in fact been constructed on the property in question and is presently being operated pursuant to all conditions imposed, including the two being challenged in this proceeding.[1]

On appeal to the Circuit Court of St. Louis County, the challenged conditions were upheld. Appellants have perfected this appeal from that judgment to this court contending that there was no substantial evidence in the record before the City Council under the zoning ordinance to authorize the limitation of operation to 10:00 p.m. or to prohibit the drive-thru facility.

Ordinarily on appeal involving a determination as to whether or not there was substantial and competent evidence to support an administrative finding of fact, a detailed statement of the testimony and evidence by this court might be essential for a clear exposition of the review. However, because the City Council has issued the special permits subject to ten conditions and the issue on this appeal is limited to the narrow question of the evidentiary basis supporting only two of those conditions, we will not burden this opinion with a recitation of all the testimony adduced at the public hearing before the City Council. However, some reference to the testimony is essential to a better understanding of the evidence appertaining to the specific issue raised on this appeal.

The property in question has been leased to McDonald's Corporation which has erected a drive-in restaurant and parking area thereon pursuant to special use permits granted by respondents subject, as heretofore indicated, to ten conditions. The two conditions being challenged by appellants are:

2(d) The hours of operation shall not be earlier than 7:00 a.m. and not later than 10:00 p.m. on any day.

2(g) There shall be no drive-thru facility.

---

1. Appellants' standing as litigants is apparently based in part on a lease to McDonald's which has been amended to provide a substantial reduction in rental pending resolution of issues on this appeal. McDonald's accepted the building permit subject to the outcome of appellants' challenge to conditions 2(d) and (g). Respondents do not press in this court their contention made in the Circuit Court that appellants are estopped from contesting the validity of Ordinance 1348 by accepting the permits.

At the public hearing before the council, appellants presented evidence that the proposed hours of operation would be between 7:00 a.m. and 11:00 p.m. Sunday through Thursday and 7:00 a.m. to 12:00 midnight on Friday and Saturday. Although numerous site plans were referred to as having been presented by appellants during the pendency of the application commencing in 1977, two site plans were offered into evidence at the public hearing on February 24, 1981. Exhibit 3 was the plan before the Planning Commission at its meeting on January 21, 1981. Exhibit 4 was a modified plan filed February 6, 1981, designed to satisfy various concerns expressed by consultants for the city at the Commission meeting on January 21, 1981. Exhibit 5, an aerial photograph of the area adjacent to the property involved, was received in evidence with the modified site plan imposed upon it. To the west of the site is located Kriegshauser Mortuary which is zoned commercial and extends southwardly to the southern line of the parking area proposed for McDonald's. All four corners of the Olive-Dielman intersection including appellant's property are zoned commercial, three of which are occupied by service stations. On the east side of Dielman Road opposite the proposed restaurant there is located a service station on the corner and three residences south of the service station across from the southern portion of the McDonald's site. To the south of the proposed parking area is a 73 foot landscaped buffer zone on property owned by appellants and south of that a subdivision of single family homes consisting of eight houses built since appellant's application for rezoning was filed. Olive Street Road runs east and west and consists of four lanes separated by a median in the center. Dielman Road runs north and south and has two lanes. Traffic at the intersection is governed by electric signals.

The modified plan (Exhibit 4) provides for a square one-story building comprising 3,528 sq. feet having a seating capacity for 110 persons. There is a 45 foot landscaped area between the northern portion of the proposed drive-thru area and Olive Street Road. There is an entrance for vehicles going east on Olive Street Road and for vehicles going north and south on Dielman. This entrance is 260.55 feet south of the Olive-Dielman intersection. Traffic moving south on Dielman Road enters by means of a deceleration lane. All vehicles exit on Dielman Road. Pursuant to Condition 2(i) all traffic is one-way. Cars desiring to enter the proposed drive-thru facility would turn north after entering from Dielman and circle the building on the east and north, and arrive at the drive-thru window on the west. Cars entering from Olive could enter the drive-thru circling lanes by proceeding south of the building. The drive-thru lane according to Clayton Engineering which made a survey for appellants would provide for 15 cars plus an additional 5 cars in the acceleration lane. McDonald's experience was that at peak periods there would be 12 cars stacked waiting in the drive-thru lane. The restaurant expected to employ approximately 65–70 full and part-time employees, with no more than 20 employees at work at a given time. The traffic studies of both appellant and respondents indicate that the noon hour is the peak business hour for this type of operation. Traffic studies were made on behalf of appellants by Clayton Engineering Company and for respondents by N.C. Roden & Associates. These studies were in general agreement that even at peak periods the proposed operation would not seriously overtax the intersection of Dielman and Olive beyond existing conditions.

Jack Pyburn, the City's Planning Consultant, testified that the traffic issue was a major issue that affected the character of the neighborhood. He stated that the proposed use was one of the most intense uses that could be proposed for the site and "does offer many opportunities for impact on the adjacent neighborhood." He stated the use would require substantial buffering on all sides. He thought the primary impact on the character of the surrounding neighborhood would be on the four houses on the east side of Dielman Road. He felt there were four problems with respect to

these houses. First, automobile lights from cars exiting on Dielman Road. This could be minimized by substantial landscaping on both sides of the street. The second problem was noise from automobile horns and talking on the parking lot, which presented an "enforcement problem" on the city's part. Landscaping would help this in some degree. Thirdly, "smell" from cooking odors. He thought this could be minimized by proper equipment. Finally, "litter" which like noise presents an enforcement problem. He was of the opinion that the landscaping plans presented by appellants had not sufficiently addressed those issues.

Mr. N.C. Roden, President of N.C. Roden and Associates, a consultant employed by respondents to make a traffic survey, testified that he made an analysis of traffic aspects relating to the proposed plan as of August 14, 1980. He referred to his concerns as being: intersection traffic capacity, access driveway conditions, internal circulation, and parking. With respect to the traffic at the intersection of Olive and Dielman Roads by the proposed operation, there would be no substantial difference in the capacity requirements before and after operation. "The added traffic will not be critical."

With respect to the access driveway, the amount of space available for traffic to queue as it waits to obtain service at the drive-thru window was a concern. His research on similar sized McDonald operations indicated that during the mid-day peak hour as many as 19 vehicles were waiting to obtain service at the drive-thru window. His testimony primarily pertained to the plan before modification. He was of the opinion that the proposed facility had a capacity to store around 12 vehicles within the drive-thru facility. Any additional vehicles would have to wait in the driveway aisles or the entrance area, which he considered unsatisfactory. Such traffic might wait in the street area blocking south bound traffic on Dielman and causing blockage as far back as the intersection. Parking near the Olive Street entry might cause a congestion and back-up on Olive Street. His initial conclusion was that:

"It is not possible to say, based *on a traffic impact analysis,* that a McDonald's Restaurant should or should not be constructed on the southwest corner of Dielman and Olive.... If the restaurant is constructed, the capacity of the intersection of Dielman and Olive will not be seriously overtaxed beyond existing conditions. The accident experience may be worsened since additional turning movements are being added to the most heavily accident involved approach. Circulation at the driveway entrances and within the site appears to pose significant problems."

Roden testified, however, that the modified plan (Exhibit 4) addressed the problem of congestion along Dielman by providing a deceleration lane and an adequate turning radius into the facility so that if vehicles do queue on southbound Dielman they can do so out of the travelled way and normal traffic could pass without causing congestion. He found the same to be true by reason of the set back of the parking area near the Olive Street entrance. He also thought the parking spaces should exceed the proposed 80 in number by 10%. He testified that the modified plan of January 28, 1981 still left considerable potential for confusion relative to the northern most entrance exit driveway on Dielman Road in that it provided for two way traffic and still permitted vehicles to park and unpark in the immediate vicinity of that entry. As will be seen, most, if not all, of these concerns were eliminated or ameliorated by the eight conditions which appellants do not contest.

Ms. Ida Mae Herzmark, a member of the Planning and Zoning Commission, testified that they approved the operation without the drive-thru because they felt the drive-thru would be a hazard at the intersection. Mr. Ted Horowitz, Chairman of the Planning and Zoning Commission, testified that the Commission voted 6 to 2 to approve the restaurant without the drive-thru facility because it was thought that it placed an undue burden of congestion to traffic dur-

ing peak periods, especially the evening rush hour period. It also caused general confusion of the traffic flow on the site itself and that would be a most difficult thing to police. He stated that the site as it existed was a "blight on our community. And in my mind, that was a very important consideration for voting in favor of this proposal...." "I think this was an attempt to compromise a very difficult situation, especially with the configuration of the land. The ingress and egress limitations to it. I think that every care can be taken to safeguard as much as possible, the surrounding residential community from the adverse conditions of a drive-in restaurant."

The testimony in addition included comments of various residents of Olivette all of whom for the most part opposed the granting of the special use permits in their entirety. Much of the testimony went to the traffic problems and concerns which might be created by the proposed operation and the effect on adjacent property values.

■ This appeal being taken from the findings and ruling of the City Council of Olivette acting in an administrative capacity, our review is limited to an examination of the record before us to ascertain whether or not there is competent and substantial evidence to support the conditions imposed and whether the Council's findings were reasonable in the light of the evidence. We review the evidence in the light most favorable to the council's decision. *State ex rel. C.C.G. Management Corp. v. City of Overland, et al.,* 624 S.W.2d 50, 54 (Mo.App. 1981); *Moore v. Board of Education of the Special School District of St. Louis County,* 547 S.W.2d 188, 191 (Mo.App.1977).

Section 280.240 of the Olivette Zoning Ordinance provides in part as follows:

"Before issuance of any special permit for any of the above buildings or uses, the Council shall refer the proposed application to the Planning and Zoning Commission which shall make a report regarding the effect of such proposed building or use upon the character of the neighborhood, traffic conditions, public utility facilities and other matters pertaining to the general welfare. No action shall be taken upon any application for a proposed building or use above referred to unless and until the report of the Commission has been filed. In acting upon any application, the Council shall give due regard to the foregoing standard and shall grant such permit if it finds that such action is in the best interest of the public health, welfare, safety and morals."

■ Appellants do not challenge the right of the City Council to impose reasonable conditions as a part of a special use permit and, as indicated, McDonald's has in fact complied with all of the conditions, including the two challenged on this appeal. Appellants contend, however, that there was no substantial evidence before the Council to permit it, under the above standards to impose conditions 2(d) and 2(g). They contend that the portion of the ordinance providing that the "Council shall give due regard to the foregoing standard and shall grant such permit if it finds such action is in the best interest of the public health, welfare, safety and morals" does not constitute in itself an additional standard but provides the criteria by which the standards "character of the neighborhood, traffic conditions, and public utility facilities" must be measured. On the other hand respondents suggest that these concerns affecting the general welfare constitute a viable standard upon which the Council may act. We agree with appellants. *State ex rel. Ludlow v. Guffey,* 306 S.W.2d 552, 558 (Mo. banc 1957); *State ex rel. Steak n Shake, Inc. v. City of Richmond Heights,* 560 S.W.2d 373, 379 (Mo.App.1977).

In *Ludlow* the Supreme Court sustained a Webster Groves Ordinance providing practically the same language as that before us. It held that under the ordinance whether or not a proposed use would affect the "health, safety, morals or general welfare" depended on a finding by the Council based on evidence before it determining whether or not the use "would or would not adversely affect 'the character of the neighborhood, traffic conditions, public utility facilities

and other matters pertaining to the general welfare'." Such finding must be made upon facts and evidence before it and the discretion granted the Council must be reasonable and not arbitrarily exercised.

We further note the comment of this Court in *Steak n Shake v. City of Richmond Heights,* 560 S.W.2d at 377, that the reference to "public health, safety and general welfare" grants no authority to impose as a condition for the use of land, that the use affirmatively promote the public health and general welfare in addition to not having an adverse effect. With the above principles in mind we now consider whether there was competent and substantial evidence before the Council to sustain conditions 2(d) and 2(g) of Ordinance 1348.

Condition 2(d) provides: "The hours of operation shall be not earlier than 7:00 a.m. and not later than 10:00 p.m. on any day." The effect of this condition is to reduce the closing time one hour during the period Sunday through Thursday and two hours on Friday and Saturday. This condition was not included in the recommendations of the Planning and Zoning Commission or suggested by any witness or in any report offered in evidence so far as we can determine. The findings of Fact entered by the City Council applicable to condition 2(d) would apparently be Item 11(a) as follows:

"11. The determination to grant or deny the special permits is based on the effect of the proposed activities on the character of the neighborhood, traffic conditions, public utility facilities and other matters pertaining to the general welfare. In this regard, it is the finding and judgment of the Council:

(a) The proposed restaurant and related parking is an intense use which presents many *possible* opportunities for impact on surrounding property. To minimize such impact, and to avoid any adverse effect on surrounding property, and particularly the adjoining residential properties, the following conditions are essential. (Emphasis added)

... (4) The hours of operation shall not be earlier than 7:00 a.m. and not later than 10:00 p.m. on any day."

Assuming the above finding to constitute a factual finding and is not purely conclusionary, we turn to respondent's brief for illumination as to the factual basis. Respondent points to Jack Pyburn's testimony, heretofore, set forth pertaining to the possible effect of lights, noise, odor, and litter, on the homes adjacent to the entrance and exit on Dielman Road. That these annoyances, if they continue to exist to any extent after the extensive landscaping, shielding, and policing required by conditions 2(a)(b)(e) and (f), have an effect on the character of the neighborhood, traffic conditions, or public utilities is not shown in the findings or established by the evidence. Pyburn conceded that proper landscaping and policing would reduce, if not eliminate much of his concerns. There was no evidence that these conditions would be any different after 10:00 p.m. than before. The only reference to such a problem is respondent's unsupported statement in their brief that whatever conditions remained, "The residents would be free of the burden of these problems by the time they would *likely* be retiring at night." (emphasis added) The record is silent on that point and we do not feel justified in taking judicial notice of the "likely" retiring habits of the occupants of the three or four residences on the east side of Dielman Road. We feel the more important consideration is whether condition 2(d) can be upheld solely to benefit the residents of the four houses on the east side of Dielman. We believe not. Respondents do not suggest or point to any evidence which would enable the Council to find that the condition is one pertaining to or affecting the "general welfare," that is, the community as a whole apart from these specific residences.

■ Generally, it has been held that a refusal to rezone based primarily upon a desire to benefit or refrain from injuring a few adjacent property owners is not substantially related to the public interest and cannot be justified on that basis. *Huttig v.*

*City of Richmond Heights,* 372 S.W.2d 833, 842–3 (Mo.1963); *Loomstein v. St. Louis County,* 609 S.W.2d 443, 450 (Mo.App.1980). We believe the principle is applicable under the evidence to the attempted imposition of condition 2(d) in this case.

Condition 2(g) presents a more difficult issue. It provides that, "There shall be no drive-thru facility." This condition was included in the recommendation of the Planning and Zoning Commission which found:

"11(b) The size and configuration of the parcel and its location at the intersection of Dielman Road and Olive Boulevard create conditions which do not allow the use of the site to the intensity proposed by the applicants. To avoid significant traffic problems and to eliminate internal traffic congestion and confusion in movement, the following conditions are essential:

(1) The drive-thru facility shall be eliminated.

(2) The number of parking spaces shall be increased to 86.

(3) The traffic plan shall provide for one-way drives, one-way circulation and angle parking."

11(b)(1) of the Findings of Fact became 2(g) of Ordinance 1348 and 11(2) and (3) became 2(h) and (i) of said Ordinance. The two later conditions have been accepted by appellants.

█ In reviewing the evidence adduced which would support finding 11(b)(1) we again do so under the restraints of standards provided by Ordinance 1348. We do not understand respondents to contend that the proposed drive-thru would have any adverse effect upon public utility facilities or the character of the neighborhood, nor would the evidence support any such contention. What respondents do contend is that the size and configuration of the parcel upon which the restaurant is situated and its location at the intersection of Olive Street and Dielman Roads create significant traffic problems and *internal traffic congestion and confusion.* (emphasis added) Respondents assert that the testimony of Mr. Roden provides the support for the

elimination of the drive-thru facility even under appellant's modified plan in that vehicles would still line up in the drive-thru lane and extend into the Dielman Road deceleration lane preventing cars going north on Dielman Road from making left turns into the entrance and thus blocking traffic northbound on Dielman. Respondents properly state that it is not for this court to substitute its judgment for that of the administrative body. We adhere to that principle but the evidence of traffic congestion upon which respondents rely considering the entire record and the testimony of respondent's own experts is essentially based on speculation and suppositions. Roden did not believe the restaurant would create an intersection traffic problem; he was satisfied that the deceleration lane would handle the queue problem on Dielman, which would nullify substantial problems either north or south on Dielman. We need not decide whether the internal traffic congestion on the McDonald's property itself absent any effect on external traffic is of legitimate concern to respondents as there is no competent or substantial evidence to support such a conclusion. It must be borne in mind that the evidence by the experts on both sides agreed that the peak operation of this facility would be at the noon hour and after 6:00 p.m., avoiding any substantial interference with heavy morning and evening rush-hour traffic on either Olive or Dielman.

Furthermore, the eight conditions not challenged by appellants practically meet all of the major concerns voiced by respondent's experts: increased parking space, thorough and complete landscaping, one-way traffic, and extensive policing of the entire area. Neither of residents' experts recommended elimination of the drive-thru facility.

It is axiomatic that the extensive development of commercial areas and their dependence on the automobile for survival poses additional traffic problems and congestion. In every case involving such development it must be recognized that such increased traffic can have a "possible" impact on the surrounding area.

In this case, eliminating the speculative evidence, we find no competent or substantial evidence which would enable us to uphold condition 2(g) of Ordinance 1348. It would appear that the Council's action in eliminating the drive-thru facility may well have been dictated, as suggested in the testimony of the chairman of its Planning and Zoning Commission, to reach a compromise which would permit development of this long "blighted" commercial site and appease the opponents of the entire use of the site as a McDonald's restaurant.

The judgment of the Circuit Court is reversed with directions to enter an order holding invalid sections 2(d) and 2(g) of Ordinance 1348 of the City of Olivette.

SNYDER, P.J., and DOWD, J., concur.