**MARTIN MARIETTA MATERIALS, INC., et al., and State of Missouri ex rel. Martin Marietta Materials, Inc., et al., Respondents,**

v.

**BOARD OF ZONING ADJUSTMENT OF CASS COUNTY, Missouri, and City of Peculiar, Missouri, et al., Appellants.**

No. WD 66637.

Missouri Court of Appeals,
Western District.

Dec. 11, 2007.

Application for Transfer to Supreme Court
Denied Jan. 29, 2008.

Application for Transfer Denied
March 18, 2008.

Richard G. Carlisle, Esq., Lee's Summit, Alok Ahuja, Esq., Co-Counsel, Kansas City, MO, for Respondent.

Debra Lynn Moore, Esq., Harrisonville, MO, for Board of Zoning.

James E. Thompson, Esq., Harrisonville, MO, for City of Peculiar.

Elvin S. Douglas, Jr., Esq., Harrisonville, MO, for Peculiar Com. Betterment, Cass County Citizens.

Steven E. Mauer, Esq., Kansas City, MO, for John Bockelman, Ted Turner, Ted Haynes.

Before HAROLD L. LOWENSTEIN, Presiding Judge, JOSEPH M. ELLIS, Judge and LISA WHITE HARDWICK, Judge.

JOSEPH M. ELLIS, Judge.

Martin Marietta Materials, Inc. (MMM) operates a rock quarry in Cass County near the boundary of the City of Peculiar, Missouri. Presumably reacting to the City of Peculiar's commencement of an annexation proceeding to annex land adjoining the quarry to the east, MMM contracted to purchase or lease several pieces of property,[1] totaling 648 acres, adjacent to its current quarry operation, and all within the annexation area. Shortly thereafter, MMM submitted an application under the zoning ordinance of Cass County seeking a special use permit to expand its quarrying activities into this additional property.

After adding several conditions to the proposed use, the Planning Board voted to recommend approval of the special use permit for MMM, though it expressly declined to consider evidence related to whether the proposed activity constituted a nuisance to surrounding landowners and deferred consideration of that evidence to the Board of Zoning Adjustment ("the BZA").

On May 27, 2004, the BZA held a public hearing on MMM's application. Subsequently, on June 24, 2004, the BZA unanimously denied MMM's application for a special use permit, concluding that adequate provision had not been made for "[t]he general compatibility with adjacent properties, other properties in the district, and the general safety, health, comfort, and general welfare of the community" and that the quarry should not be allowed to "expand toward surrounding residential development since this would accentuate the incompatibility of the two land uses."

MMM appealed the BZA's decision to the Circuit Court of Cass County pursuant to §§ 64.120.3 and 64.281.4.[2] On November 4, 2005, the circuit court reversed the decision of the BZA, concluding that the decision was not supported by substantial and competent evidence on the record as a whole. The court remanded the case to the BZA with instructions to issue the special use permit.

■■■ The BZA, the City, and additional intervenors appeal from the circuit court's judgment. But, as the party aggrieved by the BZA's decision, MMM assumes the role of the appellant in this action. **Rule 84.05(e).** This is because "[a]ppellate review of a contested agency decision is upon the findings of fact and conclusions of law of the agency, not the findings and conclusions of the circuit court." *State ex rel. Fred Weber, Inc. v. St. Louis County, Mo. Bd. of Zoning Adjustment,* 205 S.W.3d 296, 298 (Mo.App. E.D.2006). "The scope of review is whether the decision of the zoning board was legal in the sense of being authorized by law and whether it is supported by competent and substantial evidence upon the whole record."[3] *Id.*

---

1. The property at issue is presently owned by relators Effertz Brothers, Inc. and Leslie and Ruth Britton.

2. All statutory references are to RSMo 2000 unless otherwise noted.

3. "Competent evidence is relevant and admissible evidence that can establish the fact at issue." *State ex rel. Gannett Outdoor Co. of Kansas City v. City of Lee's Summit,* 957 S.W.2d 416, 419 (Mo.App. W.D.1997). "Sub-

■ In its first point, MMM contends that the BZA erred in denying the application for a special use permit because the BZA improperly relied upon findings about "general compatibility" and "general welfare" in reaching that decision. MMM claims that denial of the application on this basis was an abuse of discretion, was unlawful, and was arbitrary and capricious.

Article II of the Cass County Zoning Ordinance provides that "[a] special use permit provides permission under special conditions to make certain special uses of land in certain zoning districts as stipulated in each of the district zoning regulations." The Zoning Ordinance requires that:

> [b]efore any permit shall be granted the Planning Commission shall make written findings certifying that adequate provision has been made for the following:
>
> 1. The location and size of the proposed use in relation to the site and to adjacent sites and uses of property; and the nature and intensity of operations proposed thereon.
>
> 2. Accessibility of the property to police, fire, refuse collection and other municipal services; adequacy of ingress and egress to and within the site; traffic flow and control; and the adequacy of off-street parking and loading areas.
>
> 3. Utilities and services, including water, sewer, drainage, gas, and electricity, with particular reference to location, availability, capacity and compatibility.
>
> 4. The location, nature, and height of buildings, walls, fences, and other improvements; their relation to adjacent

property and uses; and the need for buffering and screening.

> 5. The adequacy of required yard and open space requirements and sign provisions.
>
> 6. **The general compatibility with adjacent properties, other properties in the district, and the general safety, health, comfort and general welfare of the community.**

(Emphasis added.) After making those findings, the Ordinance requires the Planning Board to make a recommendation to the BZA,[4] which then decides whether to grant or deny the application. In regard to granting or denying the application, Article III of the Zoning Ordinance states:

> The [BZA] is hereby *authorized to decide whether special use permits shall be granted* subject to the general and specific standards in the Ordinance; to grant special use permits with such conditions or restrictions as are appropriate to protect the public interest and to secure compliance with this Ordinance; and to **deny requests which fail to satisfy the standards and requirements contained herein and which are not in harmony with the purposes and interest of this Ordinance and the health, safety, and welfare of the community.** The [BZA] *shall decide whether special use permits shall be granted* only after having received a recommendation from the Planning Commission. In no event shall a special use permit be granted where the proposed use is not authorized by the terms of this Ordinance, or where the standards of this Article are not met.

stantial evidence is competent evidence which, if believed, would have probative force upon the issues." *Id.*

4. The text of the ordinances presented at the hearing all read "the governing body" rather

than referencing the BZA; however, the hearing transcript reflects that the county commission voted to create a BZA and to amend the ordinances to reflect that the BZA was to handle applications for special use permits.

(Emphasis added.) The Zoning Ordinance further provides: "**In no case shall a special use permit be granted if the proposed use will constitute a nuisance or a public health or safety hazard to adjacent properties or to the community at large.**"[5] (Emphasis added.)

In its Findings of Fact and Conclusions of Law, the BZA found that the land surrounding the property is primarily used for agricultural and single-family residential use and that the surrounding property "has developed primarily for residential use and is prime residential development." The BZA further noted that the subject property and the surrounding property abut the corporate limits of the City and that all this land was the subject of annexation proceedings initiated by the City. The BZA concluded:

1. It appears that most of the requirements for the special use permit have been met with the exception of Article VIII Section C Item 6 which reads as follows: The general compatibility with adjacent properties other properties in the district and the general safety, health, comfort and general welfare of the community.

2. The quarry should not expand toward surrounding residential development since this would accentuate the incompatibility of the two land uses.

3. In considering the best interests of the entire community and not just the interest of particular property owners or neighboring property owners, the Board of Zoning Adjust-

ment concludes that the permit application should be denied.

4. The Board of Zoning Adjustment concludes that the Applicant has not made a sufficient showing to warrant the *granting of the application,* and the application for special use permit is, therefore, denied.

MMM contends that the BZA had no authority to deny a special use permit based upon concerns about "general compatibility" or "general welfare." It claims these are legislative concerns that have no place in an administrative decision to grant or deny a special use permit.

The ordinance specifically calls for the Planning Commission to certify that adequate provision has been made with regard to "[t]he *general compatibility* with adjacent properties, other properties in the district, and the general safety, health, comfort and *general welfare* of the community." (Emphasis added.) Furthermore, Article III of the ordinance calls for the BZA to deny an application when the proposed use is "not in harmony with the purposes and interest of this Ordinance and the health, safety, and *welfare of the community.*" (Emphasis added.) The Zoning Ordinance also provides: "In no case shall a special use permit be granted if the proposed use will constitute a nuisance or a public health or safety hazard to adjacent properties or to the community at large." Thus, the ordinance expressly requires the BZA to consider compatibility with other properties and the welfare of the community in deciding whether to grant or deny an application for a special use permit.[6] Such considerations have

---

5. In making its findings and recommendation in the case at bar, the Planning Board expressly declined to consider evidence related to whether the proposed activity constituted a nuisance to surrounding landowners, as rec-

ommended by the staff, and deferred consideration of that issue to the BZA.

6. In addition, Article 9 of the County Procedural Manual states: "Certain uses or exceptions are permitted in some zoning districts,

been held to properly support the denial of a special use permit. *See Moto, Inc. v. Board of Adjustment of City of St. Louis,* 88 S.W.3d 96, 102–03 (Mo.App. E.D.2002) (holding that the Board of Adjustment did not err in denying a conditional use permit because competent and substantial evidence supported a finding that the proposed use would not complement or be compatible with surrounding uses).

MMM relies on *Sandbothe v. City of Olivette,* 647 S.W.2d 198 (Mo.App. E.D. 1983), as support for its contention. In *Sandbothe,* the Eastern District of this Court held that an ordinance provision requiring the council to give due regard to whether granting a special use permit was in "the best interest of public health, welfare, safety and morals" provided the criteria by which the standards "character of the neighborhood, traffic conditions, and public utility facilities, and other matters" must be judged and did not provide an additional standard in itself. *Id.* at 203. MMM's reliance is misplaced. The *Sandbothe* court was interpreting a specific ordinance, with wording and provisions completely different from that under consideration in this case. Indeed, the language in *Sandbothe* referencing "the best interest of the public health, welfare, safety and morals" was contained in a separate sentence at the end of the ordinance, *id.,* rather than as one of the listed factors specified in the ordinance now before us. Moreover, to the extent that *Sandbothe* has any relevance to the case at bar, it actually lends support to the BZA's actions in considering the compatibility of the quarry expansion with the

neighboring properties and the welfare of the immediate area.

Contrary to MMM's position, the BZA did not determine that quarrying was not a permitted use in agricultural districts or rezone the property. The property clearly retained its zoning as agricultural and, had the property been surrounded by other agricultural property, the BZA almost assuredly would have granted the special use permit. The BZA merely determined that, considering the specific evidence related to the piece of property at issue, the quarry expansion would not be consistent with the residential property surrounding it and that it was contrary to the general welfare,[7] factors it was expressly allowed to consider under the ordinance. Point denied.

■ In its second point, MMM contends that the 24 factual findings issued by the BZA all supported granting, rather than denying, its application for a special use permit. MMM argues that the findings satisfied all of the standards referenced in the local ordinance for granting a special use permit and that the BZA's conclusion that the sixth factor was not satisfied is not supported by those findings.

In its findings of fact, the BZA found that "[t]he land surrounding the Subject Property is primarily used for agricultural and single-family residential uses." The BZA further found that "[t]he area surrounding the Subject Property has developed primarily for residential use and is prime residential development." In addition, the BZA noted that the property abuts the corporate limits of the City of Peculiar and that the City had initiated

---

only when a special use permit has been obtained from the Planning Commission. Such uses require special study with respect to specific location and design considerations to assure that they will have minimal negative impact on surrounding properties."

7. The Cass County Procedural Manual states that "[t]he granting of a special use permit . . . requires a case-by-case approach."

annexation proceedings related to the property. Furthermore, implicit in its conclusion that the "[t]he quarry should not expand toward surrounding residential development since this would accentuate the incompatibility of the two land uses" is a finding that quarrying on the property at issue was inconsistent with the neighboring residential land uses.

The Cass County Comprehensive Plan, which was adopted by the County Commission and which was submitted into evidence, states:

One of the most basic factors affecting the use of a given parcel of land is the use of adjoining parcels. This is due to the fact that the use of land has an impact that goes beyond the boundary of the land being used. Economists refer to this impact as a 'land use externality' because it is generally not included in the property owner's decision-making process since it is external to the efficiency and profitability of the property being used. As an example of land use externalities, a house surrounded by sand and gravel pits is less enjoyable to live in and has less value for residential purposes than the same house surrounded by similar houses. The noise, smoke and heavy truck traffic generated by the excavations are so incompatible with residential life that the value of the house declines. Yet the gravel pit owners have no economic incentive to lessen the impacts of their activities since the declining value of the house does not affect the profitability of their businesses. In effect, it is a cost imposed by the gravel pit owners on the owner of the house.... The best way to minimize these external costs is to separate incompatible land uses or buffer them from each other.

\* \* \*

In general, a residential land use is the most sensitive to adjacent land uses. This is because the characteristics which most people value in a residential area—quiet, serenity, stability, to name a few—are the most difficult characteristics to find and maintain.

\* \* \*

Finally, it is important not to think of land use externalities solely in terms of economic effects. Minimizing negative externalities and creating positive externalities can lead to a variety of benefits. Not only will property values be increased and stabilized, but social values can be reinforced, safety and convenience can be improved, and psychological stress can be lessened.

Thus, the County Commission previously determined that the operation of a quarry was incompatible with residential use of neighboring property and that such uses should be separated or buffered from each other. Indeed, the evidence presented to the BZA reinforced the concerns expressed in the Comprehensive Plan related to noise, dust, and traffic and the conclusion that such uses were incompatible. Because there is no additional agricultural property to serve as a buffer between the proposed quarry and the residential areas, that option is unavailable. The BZA's finding that the proposed quarry was surrounded by residential property and the evidence related to the problems created for adjacent property are sufficient to support the conclusion that the proposed use of the subject property as a quarry was incompatible with the adjacent property. Furthermore, the other factual findings are not inconsistent with that conclusion. Point denied.

■ In its third point, MMM claims that the BZA's conclusions that adequate

provisions had not been made with regard to "general compatibility" or "general welfare" were not supported by substantial and competent evidence. MMM argues that the BZA rejected the testimony of the neighbors related to general compatibility and that no evidence remained to support the conclusion that adequate provision had not been made related to general compatibility and general welfare.

As noted *supra*, the evidence reflected that the property surrounding the proposed quarry was residential in nature. MMM does not challenge that finding. Furthermore, several witness testified about the level of noise pollution produced by the quarry operations from blasting, heavy equipment, trucks, and backup buzzers.[8] Witnesses further indicated that the level of noise had increased as the quarry moved closer to their property. Counsel for MMM conceded that the blasting can be heard and that there were sometimes vibrations and simply focused on the fact that the expert data showed no danger to people or property adjacent to the quarry without addressing the nuisance aspect of blasting. Witnesses also testified about the dust that would frequently blow onto their property from the quarry operations. The fact that the BZA noted that those opposing the quarry failed to present expert or fact based evidence related to a

decrease in property values or the adequacy of the roads to handle the quarry traffic does not establish that the BZA discounted the neighbor's testimony in total. In addition, Tom Hammock, who lives near the quarry, testified that land had been purchased by the Raymore–Peculiar School District for a middle school four blocks from the proposed quarry expansion and that a park was also nearby. Since MMM represented that it would not begin quarrying the proposed site for at least five to eight years and that it would then continue for about twenty-five years, the BZA was certainly entitled to consider the effect the proposed quarry would have on the school, which would likely be built before quarrying began. The record also contains a resolution passed by the City of Peculiar opposing the grant of a special use permit and a petition signed by local residents opposing the issuance of the permit.

In *State ex rel. Noland Road Raceways, Inc. v. Board of Zoning Adjustment of Kansas City*, 145 S.W.3d 455, 457 (Mo. App. W.D.2004), residents testified before the Kansas City BZA that the noise generated by a racetrack was loud enough to interfere with the enjoyment of their property and had caused increased street traffic, and dust. Those witnesses "testified that the noise of the racetrack [was] both-

---

**8.** John Bockelman, who lives north of the present quarry, testified that the county assessor abated his property by five to seven percent when the quarry reached his southern border. He testified that activity at the quarry went from dawn to dusk. He presented pictures of clouds of dust coming onto his property from the existing quarry. Bockelman testified that you never knew how many blasts would occur a day or when they would occur. He stated that you could feel the blasts and would then hear them and that they created a great deal of anxiety in he and his wife.

Holly Stark, whose property borders the proposed expansion site, testified that as the

quarry had moved toward their home the noise had increased and that they are now frequently awakened by the sound of backup buzzers and heavy equipment. She testified that she had been frustrated by increases in truck traffic, dust, heavy equipment noise, and blasting noise. She indicated that these nuisances prevent her from the enjoyment of her property.

Becky Klein, who lives near the quarry, testified that the noise and dust from the quarry and the truck traffic on the roads caused problems for the people in her subdivision, Pickering Estates. (The transcript contained in the record on appeal is missing five pages starting during Klein's testimony.)

ersome now, and will, therefore, be more of an impediment to the enjoyment of their property should BZA approve the amendment." *Id.* Another witness testified that dust and unsafe driving conditions were also hazardous. *Id.* This Court noted that, in order to affirm the BZA's decision, we must only find "reasonable and substantial evidence" to support it. *Id.* Based on the foregoing evidence, this Court held that the BZA's denial of the application for a conditional use permit to expand the racetrack was supported by substantial and reasonable evidence. *Id.* at 457–58.

We see nothing in the case at bar to cause us to differentiate this case from *Noland Road Raceways.* Nearby residents testified about the bothersome nature of the quarry, how the conditions had gotten worse as the quarrying had moved closer to them, and how it would become an even bigger nuisance if allowed to expand. *See also Moto, Inc.,* 88 S.W.3d at 102–03 (holding that the Board of Adjustment did not err in denying the conditional use permit for a fuel station and convenience store because competent and substantial evidence related to noise and traffic supported a finding that the proposed use would not complement or be compatible with surrounding uses and proposed uses). The decision of the BZA to deny the application for a special use permit was supported by the evidence. Point denied.

█ In its final point, MMM contends that substantial and competent evidence supported the BZA's conclusion that adequate provision had been made to protect neighboring property owners and that evidence supporting that conclusion could not properly support a finding related to "general compatibility" or "general welfare."

While the BZA entered findings of fact identifying the conditions under which MMM agreed to operate the quarry *(i.e., setbacks, berms, fences, no increase in production at existing facility)*, it made no factual findings related to what extent those conditions served to minimize the negative externalities generated by the quarry and the overall incompatibility of the two property uses. While the BZA concluded that adequate provision had been made related to the first five factors, the BZA's conclusion that adequate provision had not been made to account for the overall inconsistency of the proposed quarry with the surrounding residential property resulted from the cumulative effect of all the externalities generated by the quarry. For this reason, the conclusions of the BZA need not be viewed as inconsistent and, under our standard of review, must be affirmed.[9] Point denied.

█ The BZA's denial of MMM's application for a special use permit is affirmed.[10]

9. Even if the conclusions reached by the BZA with regard to the first five factors were inconsistent with its conclusion on the sixth, that inconsistency in conclusions would, at most, merit remand to the BZA for further findings and conclusions and would not dictate issuance of the special use permit.

10. We note that, even if the BZA's decision had required reversal, the matter could well prove to be moot. The record reflects that, prior to the filing of the application for a special use permit, the City of Peculiar had initiated proceedings to annex the property at

issue. At oral argument, counsel represented that the annexation had been approved by the circuit court and was presently being challenged on appeal.

Once land is annexed from the county to a municipality, the city assumes legal control over the property. *Dahman v. City of Ballwin,* 483 S.W.2d 605, 609 (Mo.App. E.D. 1972). Accordingly, annexation of property by a municipality deprives the county of its control and planning over the annexed area's development. *City of Town & Country v. St. Louis County,* 657 S.W.2d 598, 612 (Mo. banc 1983) (Gunn dissenting). Once annexation is

LOWENSTEIN, J., concurs in separate opinion.

HARDWICK, J. dissents in separate opinion.

HAROLD L. LOWENSTEIN, Judge, concurring.

I concur in the opinion of Judge Ellis. Under the facts here, I believe the county BZA, the local authority operating under county ordinances, had the power to deny a special use permit whether or not the City of Peculiar intended to annex the property. I further believe Cass County could successfully defend the denial of a special use permit, even if the five specific criteria of the ordinance were satisfied by the applicant, because there was sufficient evidence of the more general sixth criterion that the project was not compatible with adjacent properties and with the general safety, health, and comfort of residential homeowners. I believe a local authority with an ordinance such as here, may, with sustainable findings, deny a special use permit on a general criteria of compatibility, even where the applicant appears to meet all the specific criteria.

A special use permit means just that: a special permit that allows a locality to control or limit uses of real estate, which are inherently hazardous to the general public or to nearby landowners, but, which uses may be desirable for many reasons, including economic reasons. *State ex rel. Barber & Sons Tobacco Co., Inc. v. Jackson County*, 869 S.W.2d 113, 117 (Mo.App. 1993). The use of special permits by governing bodies is afforded with a great deal of latitude and the governing body can best weigh potential benefits against threats to neighbors. *Id.* Governing bodies may consider zoning and use of the

surrounding property. *West Lake Quarry v. City of Bridgeton*, 761 S.W.2d 749, 751 (Mo.App.1988). In the case at bar, residential use around the existing quarry operations was growing and getting closer to the subject area. As in *Barber*, the decision for the BZA was between profitability on one side and the effects of a quarry operation on residential owners on the other.

MMM bore the burden of challenging the reasonableness of BZA decisions. *Elam v. City of St. Ann*, 784 S.W.2d 330, 335 (Mo.App.1990). The evidence here was that even with a promised five to eight year delay in quarry operations on this particular parcel, the effect on present and future homeowners outweighed the remedial actions of the applicant.

LISA WHITE HARDWICK, Judge, dissenting.

I respectfully dissent from the majority opinion affirming the BZA's denial of the special use permit. Because the BZA's decision is inconsistent with its findings of fact and is unsupported by competent and substantial evidence, I would reverse and remand the cause for issuance of the special use permit.

In reaching this conclusion, I am mindful that our scope of review is limited to determining whether the BZA's decision "is supported by competent and substantial evidence upon the whole record or whether the judgment is arbitrary, capricious, unreasonable, unlawful or in excess of its jurisdiction." *State ex rel. Noland Rd. Raceways, Inc. v. Bd. of Zoning Adjustment of Kansas City*, 145 S.W.3d 455, 456 (Mo.App.2004). We cannot substitute our judgment on the evidence for that of

completed, assuming it is affirmed on appeal, the BZA will be divested of jurisdiction over the property at issue, and, instead, the city

will have jurisdiction. *City of Ballwin v. Hardcastle*, 765 S.W.2d 324, 329 n. 2 (Mo.App. E.D.1989).

the BZA, and we must defer to the agency's findings on the weight of the evidence and credibility of witnesses. *Roorda v. City of Arnold,* 142 S.W.3d 786, 789 (Mo. App.2004).

The BZA denied the special use permit based solely on its conclusion that the quarry expansion was "incompatibl[e]" with the surrounding residential development. In Point II of this appeal, MMM contends the decision is unsupported by substantial and competent evidence, in that the BZA rejected the opinion testimony of neighboring property owners and made findings of fact contrary to its determination of incompatibility. MMM further argues the BZA's denial was an abuse of discretion because the proposed use of the property met the County's standards for a special use permit.

Under local administrative procedures, property owners may be allowed to seek a special use permit to use land in a way expressly permitted under conditions set forth in the zoning ordinance. *State ex rel. Presbyterian Church of Washington, Mo. v. City of Washington,* 911 S.W.2d 697, 701 (Mo.App.1995). As a general rule, if the proposed use satisfies the ordinance standards, the zoning agency is *required* to issue the special use permit, subject to reasonable conditions that would mitigate any harmful effects from the proposed use. *Id.*

The Cass County Zoning Ordinance, Article VIII, Section C, allows the issuance of a special use permit upon a showing that "adequate provision has been made for the following:"

1. The location and size of the proposed use in relation to the site and to adjacent sites and uses of property; and the nature and intensity of operations proposed thereon.

2. Accessibility of the property to police, fire, refuse collection and other municipal services; adequacy of ingress and egress to and within the site; traffic flow and control; and the adequacy of off-street parking and loading areas.

3. Utilities and services, including water, sewer, drainage, gas, and electricity, with particular reference to location, availability, capacity and compatibility.

4. The location, nature, and height of buildings, walls, fences, and other improvements; their relation to adjacent property and uses; and the need for buffering or screening.

5. The adequacy of required yard and open space requirements and sign provisions.

6. The general compatibility with adjacent properties, other properties in the district, and the general safety, health, comfort and general welfare of the community.

MMM and neighboring property owners presented evidence to address these standards at the BZA hearing. Following the hearing, the BZA ruled that MMM made adequate provisions for all of the standards except the general compatibility requirement in item six. The BZA also made the following findings of fact:

1. The Subject Property is currently zoned agricultural.

2. The land surrounding the Subject Property is primarily used for agricultural and single-family residential uses.

3. The area surrounding the Subject Property has developed primarily for residential use and is prime residential development.

4. The Subject Property is the subject of annexation proceeding initiated by the City of Peculiar, Missouri, and the property abuts the corporate limits of the City.

5. Martin Marietta currently operates a rock quarry adjacent to the Subject

Property (the "Existing Quarry"). Quarrying in the vicinity of the Subject Property began approximately fifty years ago and has continued to the present.

6. Limestone is an important natural resource both to the County and other governmental entities and to [sic] for private construction in the region.

7. There is a significant amount of limestone located on the Subject Property.

8. Quarrying is permitted upon land zoned agricultural upon obtaining a special use permit pursuant to the provisions of the Cass County Zoning Ordinance. The purpose of the special use permit is to allow an opportunity to explore conditions mitigating the permitted use. The application was remanded by the Cass County Circuit Court because the conditions were not discussed when the application was previously considered by the County.

9. As proposed by Martin Marietta, only limestone extraction will occur on the Subject Property; no processing, stockpiling or sales of limestone will take place on the Subject Property. Processing, stockpiling and sale of limestone will continue to take place on the Existing Quarry. There will be no increase in the intensity of production or expansion of the existing processing facilities as a result of the grant of the Special Use Permit.

[10].[1] There are existing fire, police and other municipal services, which serve the Subject Property.

[11] Drainage from the Subject Property will be through the Existing Quarry; none of the drainage will travel across property not owned or leased by Martin Marietta.

[12]. Sewer connections and gas are not necessary for the operation of the quarry. There is existing water and electrical service to the Subject Property.

[13]. There are underground natural gas lines, overhead electrical lines and a backup water service line located on the Subject Property.

[14]. No new buildings will be constructed on the Subject Property.

[15]. Prior to commencing quarrying on the Subject Property, Martin Marietta shall construct a fence not less than six feet (6') in height on all boundaries of the Subject Property which adjoin land not owned or leased by Martin Marietta or a road right of way. Such fence will be located at least fifty feet (50') from the edge of any excavation.

[16]. On all boundaries of the Subject Property which adjoin land not owned or leased by Martin Marietta, Martin Marietta shall provide, prior to the commencement of quarrying on the Subject Property, berms to reduce noise and sight distractions where deemed necessary by the County Zoning Officer. Such berms shall be not less than eight feet (8') in height and shall have a slope of not greater than 3:1. Temporary berms shall be constructed along property lines which do not adjoin land owned by Martin Marietta. These shall be constructed of topsoil, and shall be flattened as part of reclamation when quarrying adjacent to the berm is completed. Permanent berms shall be constructed or (sic) shale and other non-topsoil overburden, with topsoil on top for vegetation, along road rights of way.

[17]. Quarrying operations will be set back not less than one hundred feet (100') from property boundaries. All

---

1. The actual BZA decision contains two paragraphs numbered as 9.

quarrying and mining operations shall be set back one hundred feet (100') from any road right of way or property line adjoining property not owned or leased by Martin Marietta, measured at the surface, and shall be set back one thousand feet (1,000') from Harper Road. Within such setbacks, Martin Marietta shall not build or store equipment or quarrying materials, but Martin Marietta may build berms and/or fences. In addition, Martin Marietta will not conduct blasting within six hundred feet (600') of any habitable structure in existence on March 30, 2004.

[18]. Martin Marietta has submitted a site development plan showing the proposed use.

[19]. Ex parte evidence has not been considered by the Board in reaching its decision.

[20]. The City of Peculiar has commenced the process of annexing the Subject Property but has not completed such annexation, which requires court review and approval. The Subject Property remains in the County, subject to County jurisdiction.

[21]. The Existing Quarry is operating in accordance with all applicable laws of the County, including the Special Use Permit issued on a portion of the Existing Quarry in 1997.

[22]. Martin Marietta presented testimony and evidence to the Planning Board and the Board of Zoning Adjustment that the grant of the special use permit would not reduce the property value of nearby property. No fact based evidence or expert testimony was provided to the contrary.

[23]. Martin Marietta presented testimony and evidence to the Planning Board and the Board of Zoning Adjustment that the roads are adequate for the operation of a quarry on the Subject Property and that truck traffic from the operation of the quarry is not harmful to the community. No fact based evidence or expert testimony was provided to the contrary.

[24]. The County Planning Board has recommended approval of the special use permit.

Of these findings, numbers 3, 4, 15, 16, 17, 22, and 23 relate to the general compatibility of the quarry operation with surrounding neighborhoods and the safety, health, comfort, and welfare of the residents therein. The subject findings indicate that the surrounding property was primarily used for residential development. Neighboring residents testified, during the BZA hearing, that the new quarry would adversely affect their property values and result in increased noise, dust, unsightly distractions, and traffic congestion. The BZA found that MMM had addressed those concerns by agreeing to blasting restrictions, setback rules, and the construction of permanent berms and fences around the quarry. The BZA also found that MMM had presented credible evidence to show that the quarry operation would neither reduce surrounding property values nor create harm to the community from truck traffic. Notably, the BZA found that neighboring property owners failed to produce any "fact-based evidence or expert testimony" to the contrary.

The BZA's findings are fully supported by evidence in the record. However, the findings do not support the conclusion ultimately reached by the BZA with regard to item 6 of the zoning ordinance. None of the agency's twenty-four findings provide any facts to suggest that the quarry operation is incompatible with the surrounding residential development or the general welfare of the community residents. In fact, the relevant findings indicate the opposite: that MMM took adequate provi-

sions to make the quarry compatible with adjacent properties.

The majority opinion correctly observes that the testimony of neighboring residents ostensibly supports the BZA's conclusion that the quarry was incompatible with residential development. However, that testimony was expressly rejected by the BZA on the critical issues of property values and traffic congestion. The BZA made no findings whatsoever to credit the concerns of neighboring property owners. The applicable standard of review requires us to examine the record to determine if the facts found are supported by substantial evidence. *Roorda,* 142 S.W.3d at 789. The fact-finding function rests with the BZA, and "even if the evidence would support either of two findings," we are bound by the BZA's factual determinations. *Id.* at 789–90 (*quoting Orion Sec., Inc. v. Bd. of Police Comm'rs of Kansas City,* 90 S.W.3d 157, 163 (Mo.App.2002)). Because the record supports the BZA's findings that the expanded quarry would not harm the interests of surrounding property owners, we must defer to those factual determinations even though there is evidence to the contrary.

The facts, as found by the BZA, do not provide substantial evidence to support the denial of the special use permit. The BZA acknowledged that MMM satisfied the first five requirements of the zoning ordinance, but the findings of fact also indicate that MMM fulfilled the sixth requirement by showing that adequate provisions were made to insure the compatibility of the quarry with surrounding properties and residents. The findings demonstrate that the proposed use met local standards and, therefore, the BZA was obligated to issue the special use permit subject to reasonable conditions to mitigate any potential harm. *Presbyterian Church of Washington, Mo.,* 911 S.W.2d at 701.