**F.W. DISPOSAL SOUTH, LLC, Respondent,**

v.

**ST. LOUIS COUNTY, Appellant.**

**No. ED 84765.**

Missouri Court of Appeals,
Eastern District,
Division Three.

May 24, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 18, 2005.

Application for Transfer Denied
Aug. 30, 2005.

Management Services, that the Commission erred in closing the record on Claimant's request for additional benefits before they submitted certain deposition testimony as it is not raised in a cross-appeal. *See Omaha Indem. v. Pall, Inc.*, 817 S.W.2d 491, 499 (Mo. App. E.D.1991).

Jeffrey B. Hunt, St. Louis, MO, for respondent.

Robert D. Arthur II, Clayton, MO, for appellant.

## OPINION

GLENN A. NORTON, Judge.

This case concerns the validity of section 607.805 of the St. Louis County Revised Ordinances, which requires certain solid waste facilities to be located at least 1,000 feet away from churches and other residential buildings. FW Disposal South, LLC ("FWD South") sought a declaratory judgment to prevent St. Louis County from enforcing the ordinance. The trial court found that the ordinance was an invalid zoning ordinance and granted summary judgment in favor of FWD South. The County appeals. We affirm.

## I. BACKGROUND

### A. The County's Licensing and Zoning Procedures

St. Louis County is a charter county. *Schmoll v. Housing Authority of St. Louis County,* 321 S.W.2d 494, 498 (Mo.1959) (citing Mo. CONST. art. 6, section 18). Its Charter gives the St. Louis County Council power to license and regulate the collection and disposal of solid waste by enacting ordinances. CHARTER art. II, sections 2.180.11–.11a. These ordinances are found in the County's "Waste Management Code." *See* Chapter 607, St. Louis County Revised Ordinances. The term "solid waste processing facility" includes a "transfer station," which is "a site or facility which accepts solid waste for temporary storage, or consolidation and further transfer to a waste disposal, processing or storage facility." Section 607.040, SLCRO. In order to construct and operate a solid waste processing facility, one must apply for a license with the Director of the County Department of Health. Section 607.380, SLCRO If the Department denies the application, then the applicant may appeal to the Council, which can uphold or re-

verse the Department's decision after a hearing. Section 607.450, SLCRO.

The County also has the power to enact zoning ordinances relating to unincorporated areas. CHARTER art. II, section 2.180.23. The County's "Zoning Ordinance" sets forth detailed procedures that the County must follow when amending its zoning regulations. Section 1003.300, SLCRO. These procedures include holding a public hearing and obtaining a report from the County Planning Commission. Section 1003.300.2, SLCRO.

**B.  FWD South and the Enactment of the Ordinance**

The material facts of this case are not in dispute. FWD South currently seeks to build a transfer station in unincorporated St. Louis County. Genesis Solid Waste Group, Inc. initially filed the application for a license to operate the transfer station with the Department, stating that it was applying on behalf of F.W. Disposal, L.L.C. ("FWD LLC"), which is a different entity than FWD South. After this application was filed, FWD South was created as a limited liability company, and a separate holding company conveyed to FWD South a limited interest in the property where the transfer station was to be built.[1]

At all relevant times, this property has been located in an "M–1" Industrial District under the County's zoning ordinance. *See* section 1003.151, SLCRO. The County admits that a transfer station is a per-

mitted use in this district, subject to the County's licensing procedures. While FWD South's application was pending before the Department, the County enacted the ordinance at issue in this case, which the parties agree would prohibit FWD South from building its proposed transfer station on the property because it is located within 1,000 feet of a church:

> **607.805  Location of solid waste processing facilities.**  No person may establish any transfer station or waste processing facility in unincorporated St. Louis County, which is located less than 1000 feet from a residence, church, school, child care center, nursery school or nursing home located in St. Louis County;  provided, however, a transfer station or waste processing facility located on nine or more contiguous acres in an industrial area may be located within 1000 feet but no closer than 800 feet of a residence, church, school, child care center, nursery school or nursing home located in St. Louis County.

Section 607.805, SLCRO. It is undisputed that the County enacted this ordinance without following its own procedures for amending its zoning regulations. Shortly after the ordinance was enacted, the Department denied the application to build the transfer station, finding, among other things, that the proposed facility would not comply with the ordinance.[2]

---

1. FWD South explains that the new entity was created and used because of a request by the Missouri Department of Natural Resources, which needed to use a different name for the "South Transfer Station" because FWD LLC had already applied for a construction permit for another transfer station elsewhere. FWD South asserts that it amended the application to reflect that FWD South was the applicant, but the County asserts that no such amendment was made.

2. The Department cited other potential problems as well, including health hazards, violation of the County's noise rules, detrimental environmental effects, past failures in complying with the Department's requirements and conditions for other existing facilities, and the fact that the County was "in the process of considering zoning regulations for waste transfer facilities." The Department wanted to avoid "approv[ing] this waste facility plan pending a determination of what regulations may finally be imposed." It appears that separate litigation regarding some of these

FWD South filed a declaratory judgment action against the County, seeking to prevent enforcement of the ordinance. FWD South alleged, among other things, that the ordinance was actually a zoning ordinance and that the County had failed to follow its own zoning procedures and requirements. The trial court denied the County's motion to dismiss for lack of standing and later granted summary judgment in favor of FWD South, finding the ordinance to be invalid and unenforceable because it had been illegally enacted. The court permanently enjoined and restrained the County from enforcing the ordinance. The County appeals.

## II. DISCUSSION

### A. Standing

■ The County argues that FWD South lacks standing to challenge the ordinance because FWD LLC—not FWD South—applied for the license to build the transfer station and FWD South was not created until after the application was filed. Additionally, the County contends that FWD South lacks standing because instead of owning the property outright, FWD South only has an estate for ten years in the property. FWD South counters that it has standing because it filed an amended application in the name of FWD South, its fee estate of ten years constitutes an ownership interest in the property and the County has in fact applied the ordinance to FWD South.

■ Our review of whether a litigant has standing is *de novo*. *Home Builders Association of Greater St. Louis, Inc. v. City of Wildwood*, 32 S.W.3d 612, 614 (Mo. App. E.D.2000). "We determine standing as a matter of law based on the petition and any other non-contested facts accepted as true by the parties at the time of the

motion to dismiss." *Crumbaker v. Zadow*, 151 S.W.3d 94, 96–97 (Mo.App. E.D.2004).

■ "Reduced to its essence, standing roughly means that the parties seeking relief must have some personal interest at stake in the dispute, even if that interest is attenuated, slight or remote." *Ste. Genevieve School District R II v. Board of Aldermen of City of Ste. Genevieve*, 66 S.W.3d 6, 10 (Mo. banc 2002). In the context of a declaratory judgment action, the plaintiff must "have a legally protectable interest at stake in the outcome of the litigation." *Id.* This test is met if there is a statutory basis for standing or if the plaintiff has been "directly and adversely affected by the action in question." *Id.* Whether a party has standing is determined by the particular facts of each case. *Citizens for Safe Waste Management v. St. Louis County*, 810 S.W.2d 635, 639 (Mo. App. E.D.1991).

Although the parties dispute whether certain documents that were submitted to the Department effectively amended the application to reflect FWD South as the applicant instead of FWD LLC, we need not resolve this dispute in order to address the issue of standing. Even if FWD South did not properly amend the application, it is undisputed that at the time of the motion to dismiss, FWD South was the legal entity seeking to construct the transfer station described in that application. The Department's rejection of the application had nothing to do with the identity of the applicant. Instead it was based, at least in part, on the ordinance.

■ Nor does the fact that FWD South has only a limited interest in the property defeat its standing. One need not show an ownership interest at all in order to have standing; a "legally cogniza-

other aspects of the Department's decision is still pending in the trial court.

ble interest" is sufficient. *Id.* at 640 n.1 (tenant living within one mile of landfill had standing to challenge approval of development plan relating to landfill). In the context of challenging a zoning decision, a party has standing as long as the decision operates "more distinctly and directly on the interest of the person claiming standing than on the public generally." *Lenette Realty & Inv. Co. v. City of Chesterfield,* 35 S.W.3d 399, 405 (Mo.App. E.D.2000).

Here, FWD South seeks to build a transfer station on property in which it has a limited property interest. Because this property is located within 1,000 feet of a church, the ordinance directly and adversely affects FWD South by purporting to prohibit the construction of the transfer station there. The County's use of the ordinance to deny the application affects FWD South more distinctly and directly than the public generally. Under these circumstances, FWD South's interest in constructing the transfer station goes above and beyond the "attenuated, slight or remote" interest necessary to confer standing. *See Ste. Genevieve,* 66 S.W.3d at 10.

Point denied.

**B. Validity of the Ordinance**

■■■ The propriety of summary judgment is a question of law, and therefore our review is *de novo. ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). The criteria for testing the propriety of summary judgment on appeal are the same as those employed by the trial court. *Id.* We review the record in a light most favorable to the County, against whom judgment was entered. *See id.* The facts set forth in support of FWD South's motion for summary judgment are taken as true unless contradicted by the County's response. *See id.* FWD South, as the party seeking summary judgment,

must establish an undisputed right to judgment as a matter of law. *Id.* at 380.

It is undisputed that the County did not follow its own procedures for amending its zoning regulations when it enacted the ordinance. Therefore, the only remaining question is whether the ordinance constitutes a zoning ordinance. FWD South argues that it is a zoning ordinance because it imposes new location and setback restrictions on the placement of solid waste processing facilities and it effectively prohibits a land use that previously had been permitted. The County contends that the ordinance's effect on the placement of these facilities does not automatically make it a zoning ordinance. Instead, the County argues, the ordinance is designed to address the health, safety and welfare concerns of the citizens of St. Louis County and therefore is a valid exercise of the County's police powers.

■■■ The term "zoning ordinance" is not defined by statute, but it generally includes ordinances that regulate "the use of land and buildings according to districts, areas, or locations." *City of Green Ridge v. Kreisel,* 25 S.W.3d 559, 563 (Mo.App. W.D.2000). Zoning ordinances also have been described as dividing land into zones and regulating both the nature of land usage and the physical dimensions of uses, such as height restrictions, setbacks and minimum area requirements. *Id.* But the mere fact that an ordinance affects where certain structures may be placed does not necessarily make it a zoning ordinance. *Id.* at 564.

■■■ Ordinances relating to zoning and those relating to public health, safety and welfare are not mutually exclusive categories. *See id.* at 563–64. "[W]hile zoning ordinances may address health and safety issues, other types of ordinances may also address health and safety issues

without becoming zoning ordinances." *Id.* In determining whether an ordinance is a zoning ordinance, we must look at its primary purpose: "where the *purpose* of an ordinance is *primarily* to regulate for health concerns rather than to provide for uniform development of real estate, then the ordinance will not be held to be a zoning ordinance, but rather an ordinance related to health and welfare." *Id.* at 564 (emphasis added) (citing *Borron v. Farrenkopf,* 5 S.W.3d 618, 622 (Mo.App. W.D. 1999)). There are at least three relevant factors to consider in determining whether an ordinance was primarily enacted for zoning purposes: (1) whether the face of the ordinance expressly states its purpose, (2) whether the provisions of the ordinance are in fact directed toward the regulation of public health and safety or instead toward providing for the uniform development of real estate and (3) whether the ordinance has the effect of amending the zoning rules by disallowing a previously-permitted land use. *See Kreisel,* 25 S.W.3d at 565–66.

██ The ordinance at issue in this case affects where solid waste processing facilities may be located by excluding them from particular areas of the County. While this might arguably bring it within the definition of a zoning ordinance, the mere fact that the ordinance affects where these facilities may be placed does not automatically make it a zoning ordinance. *See id.* at 563–64. Instead, we must determine whether the primary purpose of the ordinance was to regulate for health and safety concerns or to impose zoning requirements and provide for the uniform development of real estate. *See id.*

The ordinance does not expressly articulate its purpose, but by its terms it prevents the establishment of certain solid waste processing facilities within 1,000 feet of specified residential structures in unin-corporated areas of the County. *See* section 607.805, SLCRO. This setback requirement places no restrictions on the operation of those facilities or on the manner in which solid waste should be handled, processed, or stored. Although the ordinance was codified under the County's Waste Management Code, which sets forth detailed requirements pertaining to the licensing of solid waste processing facilities, the ordinance itself simply limits the permissible locations where those facilities may be placed. The only conceivable manner in which the ordinance can be said to regulate the environmental impact of these facilities is by requiring a buffer zone between them and the enumerated residential structures. But if there are specific health or safety concerns that will be alleviated by requiring these facilities to be 1,000 feet away from those structures, then the ordinance does not explicitly state those concerns and the County has failed to adequately explain them. Although these facilities deal with "solid waste," the County's definition of that term "does not include hazardous waste or special waste." Section 604.040.38, SLCRO. There may be inherent health concerns relating to the proposed transfer station because, as the County asserts, it would accept "a wide variety of filth." But the County does not explain how those concerns are inadequately addressed by pre-existing substantive regulations, and we are not convinced that the primary purpose of the ordinance's 1,000 foot setback was to protect the public health and welfare.

Instead, it appears as though the ordinance primarily attempts to minimize or avoid potential "not in my backyard" complaints from nearby citizens. Under these circumstances, it appears that the primary purpose of the ordinance is to restrict where solid waste processing facilities may be located in an effort to promote the

uniform development of real estate, not to protect the health, safety and welfare of the citizens of St. Louis County. Additionally, the ordinance has the effect of precluding the operation of a transfer station on FWD South's property, where that use had been permitted before the County enacted the ordinance. By explicitly disallowing this previously-permitted land use in the affected areas, the ordinance has the effect of amending the County's zoning rules. *See Kreisel,* 25 S.W.3d at 565–66 (citing *City of Louisiana v. Branham,* 969 S.W.2d 332, 337 (Mo.App. E.D.1998)). Each of these factors supports the conclusion that the ordinance was enacted primarily for zoning purposes.

Both parties argue that *Kreisel* supports their position. There, the ordinance governed the operation of junkyards. *Kreisel,* 25 S.W.3d at 561–62. In enacting the ordinance, the city did not follow the notice and hearing requirements[3] applicable to the enactment of zoning ordinances. *Id.* at 561. The Western District found that the ordinance was not a zoning ordinance directed toward the uniform development of real estate, but was instead directed toward the regulation of health and safety. *Id.* at 560.

*Kreisel* is distinguishable, however, because the terms of that ordinance were different than the terms of this ordinance and had a different effect. Unlike the County's ordinance in this case, the ordinance in *Kreisel* established requirements for the operation of junkyards and expressly provided that failure to comply with those requirements would render the junkyard a public nuisance. *Id.* at 562–63. While the express purpose of the junkyard

ordinance was to prevent nuisances, the ordinance at issue here contains no stated purpose, and the County does not argue that solid waste processing facilities inherently constitute a public nuisance. *See id.* at 565.

The ordinance in *Kreisel* applied uniform requirements to all junkyards within the city, regardless of their location. *Id.* at 563. It did not restrict junkyards to particular areas of the city and it did not limit how many junkyards could be located in a particular area. *Id.* Instead of regulating junkyards by district, the ordinance regulated their activities. *Id.* It required junkyards to be maintained in a sanitary condition, to be enclosed by a solid vertical wall of a certain height, to prevent junk from protruding onto public property or streets, to have and display state licenses and to maintain records open for inspection. *Id.* at 562, 565. Further provisions addressed concerns about preventing mosquitoes, fires, noise and foul odors. *Id.* The court in *Kreisel* concluded that these provisions were "directed toward issues which do, in fact, concern the prevention of nuisances and their abatement as a means of regulating businesses so as to promote the public health." *Id.* at 565. The ordinance at issue here, however, prohibits solid waste processing facilities in certain locations, but it does not impose any substantive requirements to govern their operation and it does not regulate how solid waste should be handled or stored.

The junkyard ordinance in *Kreisel* did not effectively preclude the operation of junkyards either. That ordinance did not explicitly "make a prior permitted land use

---

**3.** In both *Kreisel* and *Branham,* the notice and hearing requirements were based on Missouri statutes governing the zoning power given to certain local governments. *See Kreisel,* 25 S.W.3d at 560–61; *Branham,* 969 S.W.2d at 336–37. In this case, the County is a charter county and its own ordinances are the source of the procedural requirements at issue. Despite the County's suggestion to the contrary, this distinction does not alter our analysis of this case.

improper," it did not indicate what property could be used as a junkyard, it did not restrict junkyards to certain locations and it imposed no requirements that "would be so difficult to comply with that it would effectively preclude the operation of a junkyard." *Kreisel,* 25 S.W.3d at 565–66. Here, on the other hand, the County's ordinance expressly precludes the operation of solid waste processing facilities in certain locations where they previously have been allowed. The effect of this ordinance is more like the effect of the ordinance in *Branham.*

In *Branham,* even though the ordinance at issue ordinarily would not seem to constitute a zoning law because it simply contained a definition of the term "mobile home trailer park," this Court refused to allow labels to prevail over substance. 969 S.W.2d at 337. Before the ordinance was enacted, mobile homes could be placed on adjoining lots, but under the terms of the ordinance such an arrangement was prohibited because it would constitute a mobile home park. *Id.* at 334–37. Although the parties did not argue that the mobile home ordinance was related to public health or safety, this Court found that since the ordinance had the effect of prohibiting the existence of a mobile home park where one would have been allowed before, it constituted an amendment to the city's general zoning ordinance. *Id.* at

337. Since the city had failed to comply with the notice and hearing requirements applicable to amending its zoning ordinances, the ordinance was invalid. *Id.* at 336–37. As in *Branham,* the ordinance in this case effectively disallows a land use that was permitted before the ordinance was enacted. *See id.* at 337.

For these reasons, the County was required to follow its own procedural safeguards relating to zoning changes when it enacted this ordinance, and its failure to do so renders the ordinance invalid. Therefore, the County cannot use the ordinance as a basis for denying the application for a license to build a transfer station on FWD South's property, and summary judgment was proper.[4]

Point denied.

## III. CONCLUSION

The judgment is affirmed.

CLIFFORD H. AHRENS, P.J. and NANNETTE A. BAKER, J. concurring.

---

4. Nothing in this opinion prevents the County from denying the application on some other basis. Nor is the County prohibited from taking the proper steps in the future to enact ordinances that regulate the location of solid waste management facilities, which is a power it would have even if it were not a charter county. *See L.C. Development Co., Inc. v. Lincoln County,* 26 S.W.3d 336, 340 (Mo.App. E.D.2000) (citing section 260.215.2 RSMo 1994). Indeed, if the ordinance had been enacted simultaneously with other provisions that directly regulated solid waste processing facilities, so that, as a whole, the enactment had regulated both the location of those facilities and also imposed substantive restrictions on the manner in which they were operated, then our conclusion may have been different. *See Borron,* 5 S.W.3d at 619–22 (purpose of ordinance relating to concentrated animal feeding operations that included building and setback requirements as well as other requirements relating to soil, water and air quality "was to regulate for health concerns rather than for a uniform development of real estate"). But where, as here, an ordinance is primarily enacted for zoning purposes, the procedural safeguards relating to zoning changes are triggered.