

# In the Missouri Court of Appeals
# Eastern District

**DIVISION TWO**

| | | |
|---|---|---|
| KIM LYNCH, et al., | ) | No. ED107731 |
| | ) | |
| Appellants, | ) | Appeal from the Circuit Court |
| | ) | of Franklin County |
| vs. | ) | |
| | ) | Honorable Ada Brehe-Krueger |
| FRANKLIN COUNTY, MISSOURI, et al., | ) | |
| | ) | |
| Respondents. | ) | FILED: May 5, 2020 |

## Introduction

Kim Lynch ("Lynch") and Hootie's Rescue Haven ("Hootie's") (collectively "Appellants") appeal from the judgment of the circuit court upholding the decision of the Franklin County Board of Zoning Adjustment (the "Board"). The Board approved the order of the Planning and Zoning Commission (the "Commission") granting Meramec Aggregates, Inc.'s ("MAI") application for a conditional use permit for a gravel-mining operation (the "Permit"). Appellants raise two points on appeal. Appellants first argue that the voting procedure undertaken by the Commission to approve the Permit violated Franklin County's Unified Land Use Regulations (the "Regulations"), thereby invalidating the permitting process such that the Board's denial of their appeal was unlawful. Appellants next allege that the Board's decision to deny their appeal was not supported by substantial evidence. Appellants suggest the record shows MAI's proposed gravel operation would fail the jurisdictional requirements of Reg.

Section 91[1] because the gravel pit operations would be significantly detrimental to public health and safety, would substantially injure the value of neighboring property, and lacked conformity with the County master plan. Because the Commission did not violate Reg. Section 98 concerning motions for reconsideration and because the alleged violation of Robert's Rules of Order ("Robert's Rules") did not deny Appellants their due process rights, the Commission's approval of the Permit was valid under the Regulations, and the Board's approval of the Permit was authorized by law. Because the record supports the Board's determination that the jurisdictional requirements of Reg. Section 91 were satisfied, the Board's approval of the Permit was supported by competent and substantial evidence. Accordingly, we affirm the circuit court's judgment upholding the Board's denial of the Permit appeal.

Factual and Procedural History

MAI applied for the Permit in October 2016 to engage in the mining, production, and sale of sand and gravel on fifty-four acres of land near the Meramec River in Franklin County. The area surrounding the property is mainly floodplain and zoned as low-density residential or undeveloped land. In November 2016, the Commission held a public hearing on MAI's Permit application, where both MAI and Appellants attended and presented evidence as to whether the Permit should be approved.

After the hearing, the Commission's Review Committee reviewed the Permit application and recommended approval of the Permit with eleven conditions. Among the recommended conditions, one condition ("Condition No. 9") restricted all hauling to and from the site to trucks owned or operated by MAI or its associated company, Havin Material Service, Inc. ("Havin").

---

[1] All Reg. Section references are to the Article 4 of the Unified Land Use Regulations of Franklin County (2016).

2

In December 2016, MAI and Appellants attended the Commission's public meeting, during which the Commission discussed and voted on the Permit and its conditions. The Commission noted that the Review Committee's proposed conditions presented a compromise on the major issue of minimizing truck traffic and ensuring road safety. During the discussion, the Commission focused its discussion on three of the eleven conditions. One commissioner sought to confirm the Commission's consensus on the first eight conditions. The Chairman stated, "Before we need a motion, we need to get the conditions." The commissioner replied: "That's what I'm doing. For the conditions here? . . . And that's what I'm doing with my motion." He stated he wanted to move forward "[w]ithout the recommendations of 9, 10, and 11." The Chairman proceeded: "We have a motion and a second to approve [the Permit] with conditions one through eight." On that motion, the commissioners conducted their first vote, and voted five to approve and five to deny—a tie vote. The Chairman stated that the "motion is not carried." The Chairman asked if there was any further discussion, and the Commission continued to debate the remaining three conditions. At one point, the Chairman perceived a consensus to remove the eleventh condition, and a commissioner proposed a new motion accordingly. The Commission still continued to discuss a variety of combinations of approving the Permit with either nine, ten, or eleven conditions. The Commission extensively debated two proposed conditions: a condition restricting retail sales at the site ("Condition 10") and a condition restricting MAI's operation to winter months ("Condition 11").[2] The Commission specifically noted the impact of the hauling restrictions set forth in Condition No. 9 on the site's retail potential and addressed concerns about summer and winter operations. A commissioner moved to vote on the Permit with the first eight conditions plus Condition No. 9, but without

---

[2] Although the Commission employed different numbering, we have designated the conditions herein for consistency and simplicity.

3

either the condition restricting retail sales or the condition restricting operation in winter months. In this second vote on the Permit, the Commission voted six-to-four to approve the Permit with the first nine conditions. The Commission subsequently issued a written order reflecting that the Permit had been approved with nine conditions.

Appellants, including Lynch, a scientist and owner of Hootie's, and Citizens for the Preservation of the Meramec River, LLC, and Nick Norman ("Norman") appealed the Commission's order issuing the Permit to MAI. Separately, MAI also appealed the Commission's order, specifically appealing the addition of Condition No. 9. The Board consolidated the appeals and, at its public hearing on April 25, 2017, accepted arguments and evidence for both appeals.

Lynch first presented her objections to the Commission's voting procedure. Lynch argued that because there was no motion to reconsider or revote, the only legal vote taken by the Commission under the Regulations was the tie vote on the Permit with eight conditions. Lynch asserted that vote constituted a denial of the Permit. Lynch also noted that the Commission follows Robert's Rules and maintained that the Commission's second vote after the initial tie-vote did not conform to Robert's Rules. Lynch concluded that because the Commission's first vote was the only proper vote taken by the Commission, the Board was required to treat the Permit application as having been denied.

Lynch then addressed the second basis for the appeal, arguing that the Permit should have been denied because it did not meet the Regulations' jurisdictional requirements. In particular, Lynch argues that the Permit did not adequately address road safety, the impact of the gravel operation on property use, and introduced a nonconforming use to the area's homes and undeveloped lands. Residents expressed reservations about decreasing property values if the

4

Permit was granted, and Appellants presented excerpts from two scholarly studies finding a negative impact by mining operations on property values. Numerous letters from residents were included in the review packet presented to the Board. Two witnesses also spoke in favor of Appellants' appeal on the topic of road safety. Appellant Norman, speaking on behalf of a wedding venue near the proposed site, and resident Jeff Davis ("Davis") both attested to concerns with the gravel-hauling trucks contributing to dangerous traffic conditions, including a "dead-man's curve." Appellants submitted Missouri State Highway Patrol Accident Reports showing three fatal incidents on Mill Hill Road since 2010 and 133 accidents resulting in 68 injuries on Highway TT between 2006 and 2017. Appellants also offered evidence that the Missouri Department of Transportation ("MoDot") indicated it did not presently have funds to resurface or add shoulders to Highway TT, and a MoDot report on the condition of Highway TT showed maintenance work was needed and that limited funding would control which maintenance option would be selected.

MAI countered by presenting evidence and arguments before the Board supporting the Commission's vote to approve the Permit. But MAI also offered evidence challenging the Commission's inclusion of Condition No. 9 in the Permit approval. Cameron Lueken ("Lueken"), from Wunderlich Surveying and Engineering, explained that the purpose of the Permit was to allow MAI to continue mining sand and gravel in the relevant zoning district for commercial products. MAI served as the sole supplier of aggregate from the Meramec River in the County. In addition to discussing how MAI complies with the jurisdictional requirements of the Regulations, Lueken also described MAI's required adherence to further regulations such as the Missouri Standard Highway Specifications for Highway Construction and the American Site Testing Materials standards as well as standards imposed by numerous other organizations,

including the Mine Safety and Health Administration, the U.S. Army Corps of Engineers, and the Missouri Department of Natural Resources ("DNR").

MAI's site plan proposed a thirty-year operation, during which the site would be surrounded by a one-hundred-foot buffer from property lines surrounded by trees and hills, and after which the site would become a twenty-five-acre lake. The nearest residence would be no closer than 480 feet from the excavation site. The minimum distance of the next closest residences would be 850 feet and 885 feet respectively. The nearest business would be a wedding venue located 11,000 feet away to the southwest and which would operate at different peak times than the mining operation. Hootie's would be located 670 feet away, with its structures located about 1800 feet from the site. MAI emphasized two past property sales at similar distances from other Havin operations that did not reflect a decrease in property value. Regarding the potential for increased traffic, MAI presented evidence that the truck route would run three-quarters-of-a-mile on Mill Hill Road to the intersection of Highway TT. Mill Hill Road is maintained by the County, and Highway TT is maintained by MoDot. MAI stated that the highest average volume was projected at seventy trips per day. The site would be closed during peak recreational times and would be open until 3:30 p.m. on weekdays and until noon on twelve Saturdays per year.

MAI argued that the restrictions of Condition 9, which allowed only MAI and Havin to engage in hauling from the gravel-scooping site, would potentially curb retail sales at the proposed site. MAI requested approval for seventy trips per day for anticipated demand, but noted present demand was for only eighteen trips. MAI also addressed the voting issues at the Commission and proposed that the Board "cure any sort of technicality" by informally discussing the conditions at issue before taking a final vote.

6

Following the parties' arguments, the Board publicly debated the Permit and its conditions. The Board acknowledged that it is charged to review the facts received in evidence and that it is empowered to affirm, deny, or modify any order entered by the Commission. The Board discussed the Commission's findings and considered whether approving the Permit would materially endanger public safety, substantially injure the value of neighboring property, and lack harmony with the area. The Board voted to deny both Appellants' and MAI's appeals from the Commission's order approving the Permit with nine conditions. Thus, the Board approved the Permit with nine conditions. The Board issued its written findings and decision on June 15, 2017.

Appellants petitioned the circuit court under Section 64.870[3] on a writ of certiorari. In its judgment issued February 2019, the circuit court upheld the Board's approval of the Permit. This appeal follows.

Points on Appeal

Appellants raise two points on appeal. Point One argues the Board erred as a matter of law in denying Appellants' appeal and approving the Permit as granted by the Commission because the Board's decision was illegal. More specifically, Appellants posit that the Board's approval was wrongfully premised on a void and unlawful approval of the Permit by the Commission, which voted to approve the Permit within minutes of voting to deny the Permit. Appellants maintain in the alternative that the absence of a motion to reconsider, in addition to the Regulations' express prohibition against reconsideration or taking a second vote, precluded the Board from approving the Commission's approval of the Permit.

---

[3] All Section references are to RSMo (2016), unless otherwise indicated.

Point Two avers the Board's approval of the Commission's approval of MAI's Permit was not supported by substantial evidence. Appellants argue the record established that MAI's mining activity would (a) materially endanger and/or be significantly detrimental to public health and safety due to dangerous roadway conditions and deterioration, (b) substantially injure the value of neighboring property, and (c) fail to conform with the County's master plan for the area.

Standard of Review

The procedure for judicial review of a decision by a county board of zoning adjustment is set forth in Section 64.870. See Campbell v. Cty. Comm'n of Franklin Cty., 453 S.W.3d 762, 765 (Mo. banc 2015) (internal citation omitted). The aggrieved party may petition the circuit court, "stating the decision is illegal in whole or in part," and thereafter the circuit court "shall allow a writ of certiorari directed to the board of adjustment or the county commission, respectively, of the action taken and data and records acted upon[.]." Section 64.870.2. The circuit court "may reverse or affirm or may modify the decision brought up for review." Id.

"After entry of judgment in the circuit court in the action in review, any party to the cause may prosecute an appeal to the appellate court having jurisdiction in the same manner now or hereafter provided by law for appeals from other judgments of the circuit court in civil cases." Id. Appellate review under Section 64.870 is "similar to standard civil procedure in all cases in that it requires a party to first challenge the zoning decision in the circuit court and, following a decision by the circuit court, proceed with an appeal as in any other civil case." Campbell, 453 S.W.3d at 766.

When reviewing an administrative action, such as the decision of a county board of zoning adjustment, we examine the findings and conclusions of the zoning board, not the judgment of the circuit court. State ex rel. Karsch v. Camden Cty., 302 S.W.3d 754, 756 (Mo. App. S.D. 2010) (citing State ex rel. Teefey v. Bd. of Zoning Adjustment of Kansas City, 24

8

S.W.3d 681, 684 (Mo. banc 2000)); Ogden v. Henry, 872 S.W.2d 608, 611 (Mo. App. W.D. 1994) (internal citation omitted).

Our review is twofold: "[(1)] whether the decision of the zoning board was legal in the sense of being authorized by law and [(2)] whether [the decision] is supported by competent and substantial evidence upon the whole record." Martin Marietta Mats., Inc. v. Bd. of Zoning Adjustment of Cass Cty., 246 S.W.3d 9, 11 (Mo. App. W.D. 2007) (internal quotation omitted). The record consists of the proceedings before the zoning board. See Karsch, 302 S.W.3d at 756, 761; State ex rel. Jackson v. City of Joplin, 300 S.W.3d 531, 536 (Mo. App. S.D. 2009). We review a challenge to the legality of the zoning board's decision de novo as it presents a question of law. Jackson, 300 S.W.3d at 536 (citing Teefey, 24 S.W.3d at 684). For challenges to whether the decision is supported by competent and substantial evidence, we may not try the matter de novo. Karsch, 302 S.W.3d at 756 (internal citations omitted). Nor may we substitute our judgment for that of the zoning board. Id. Instead, we must view the evidence and reasonable inferences in the light most favorable to the zoning board. Id. "If the evidence would support either of two different, opposed findings, this Court is bound by the determination of the [zoning board]." Id. (internal citation omitted).

Discussion

### I.     Point One—Validity of the Application Approval

Appellants assert that the Commission's approval of the Permit was invalid because its vote violated the Regulations' prohibition against reconsideration and revoting. Consequently, Appellants argue the Board lacked lawful authority to affirm the Commission's action. We review whether the Board's actions were illegal in the sense of being unauthorized by law. See Martin Marietta Mats., Inc., 246 S.W.3d at 11.

9

MAI, the County, and the Board, (collectively "Respondents") contend that our review cannot, directly or indirectly, reach the lawfulness of the Commission's voting procedure to approve the Permit. We disagree. Respondents correctly note that our review is limited to the record of the proceedings before the Board. See Karsch, 302 S.W.3d at 761; Jackson, 300 S.W.3d at 536. Yet Appellants raised the issue of the Commission's alleged voting impropriety to the Board at the hearing. Indeed, Appellants' first argument before the Board was that the Permit approval was invalid due to the Commission's voting procedure. The Board was furnished with the Regulations, the evidence presented to the Commission, as well as the transcript of the Commission meeting. Because our purview encompasses the full proceedings before the Board, we necessarily must consider the voting impropriety alleged to have occurred at the Commission meeting. The alleged voting impropriety serves as the source of Appellants' claim that the Permit approval was unauthorized by law. See Karsch, 302 S.W.3d at 761 (noting that in reviewing what evidence this Court may review on appeal of an administrative decision, this Court looks at those parts that were presented to the Board prior to its decision). Further, because Appellants maintain that the voting procedure invalidated the entire proceeding such that the Board's decision was illegal, the Point Relied On presents a question of law that is subject to de novo review. Jackson, 300 S.W.3d at 536.

A.    Reg. Section 98 does not invalidate the Board's Permit approval

Because the Appellants only identify the Regulations as the legal justification for the Board's error in their Point Relied On, we address the Regulations first. See Rule 84.04(d)[4] (requiring a Point Relied On to state the legal reasons governing the claim of reversible error);

---

[4] All Rule references are to Mo. R. Civ. P. (2019), unless otherwise indicated.

Jackson, 300 S.W.3d at 534 (internal citation omitted) (noting that any argument not included in the Point Relied On is not preserved for review).

The Board and the Commission must adhere to the Regulations. Article 4 of the Regulations governs applications, permits, and hearings. Reg. Section 91 sets forth the general requirements for Permits:

A. An application for a conditional use permit shall be submitted to the Planning and Zoning Department.

B. Subject to Subsection C, the Planning and Zoning Commission shall issue the requested permit unless it concludes, based upon the information submitted at the hearing, that:
1. The requested permit is not within its jurisdiction according to Article 7, or
2. The application is incomplete, or
3. If completed as proposed in the application, the development will not comply with one or more requirements of these regulations (not including those the applicant is not required to comply with under the circumstances specified in Article 6, Nonconforming Situations),

C. Even if the Planning and Zoning Commission finds that the application complies with all other provision[s] of the regulations, the Planning and Zoning Commission may still deny the permit if it concludes, based upon clear and convincing evidence submitted at the hearing, for the following jurisdictional requirements:
1. The use will be significantly detrimental to public health, safety, morals, or general welfare.
2. The use will cause serious injury to neighboring property use or values.
3. The use will not be compatible with the plan for the area in question and will comply with all applicable zoning standards and regulations.

Reg. Section 91. Before issuing a Permit, the Commission must hold a public hearing on the application and give an opportunity for all persons interested in the outcome to present evidence and arguments. Reg. Section 92(A). In evaluating a Permit application, "[i]f the [Commission] determines there is substantial credible evidence supporting the application [it] shall make a motion to approve the application and determine what conditions are necessary." Reg. Section 95(A). The Commission may impose additional conditions consistent with the jurisdictional questions in Reg. Section 91 when approving a Permit application. Reg. Section 96. Regarding

11

Permit conditions, "[a] vote may be taken on proposed conditions before consideration of whether the permit should be denied for any of the reasons set forth in Section 91, Subsections B or C." Reg. Section 96(F).

In this case, MAI applied for a Permit for a new gravel-mining operation. The Commission held a public hearing at which MAI, Appellants, and other interested parties presented evidence and arguments in favor or against the Permit. See Reg. Section 92(A). The Commission's Review Committee then reviewed the Permit application and recommended approval of the Permit with eleven conditions. At the Commission's public meeting, which MAI and Appellants attended, the Commission discussed and voted on the Permit and its conditions. Given that the main points of contention centered on Condition Nos. 9, 10, and 11, one commissioner sought a vote on the Permit application containing only Condition Nos. 1–8. On that motion, the Commission voted five to approve and five to deny—a tie vote, which the Chairman acknowledged was a denial of the motion. The Commission then debated Condition Nos. 9, 10 and 11, which were a source of disagreement among the Commission members. After substantial debate, one commissioner moved to approve the Permit with nine conditions—the first eight conditions included in the previous vote and Condition No. 9, which limited hauling to and from the site to trucks owned or operated by MAI or Havin. Condition Nos. 10 and 11, which restricted retail sales and operation of the gravel operation during winter months, were omitted from the motion to approve the Permit. The Commission voted six-to-four to approve the Permit with Condition Nos. 1–9. The Permit application was therefore approved with nine conditions,[5] and the meeting was concluded with no points-of-order or objections.

_____

[5] The Regulations denote that the oral vote, rather than the written findings, constitutes the final decision.

12

Appellants posit that the Commission's vote to approve the Permit with Condition Nos. 1–9 violated the Regulations, which Appellants maintain "expressly prohibit any reconsideration or second vote on an already denied application." Although not cited in their Point Relied On, Appellants identify Reg. Section 98 in the argument portion of their brief as the regulation upon which they premise their argument. Reg. Section 98 provides:

> A. Whenever the Planning and Zoning Commission denies or revokes a conditional use permit application such action shall not be reconsidered by the board at a later time unless the applicant clearly demonstrates that:
> 1. In the sole discretion of the Planning and Zoning Commission, circumstances affecting the property that is subject to the application have substantially changed, or
>
> 2. In the sole discretion of the Planning and Zoning Commission, new information is available that could not with reasonable diligence have been presented at a previous hearing. A request to be heard on this basis must be filed with the Planning Staff within the time for an appeal to the Board of Zoning Adjustment or to the circuit court, respectively. However, such a request does not extend the period within which an appeal must be taken.
>
> B. Notwithstanding Subsection A, the Planning and Zoning Commission may at any time consider a new application affecting the same property as an application previously denied or revoked. A new application is one that, in the sole discretion of the Planning and Zoning Commission, differs some substantial way from the one previously submitted.

Reg. Section 98. Appellants reason that because a tie vote denies a motion, the vote to approve the Permit with Condition Nos. 1–8 constituted a denial of the Permit application. Appellants then argue that the subsequent vote to approve the Permit with Condition Nos. 1–9 was an improper reconsideration of the same Permit application due to the lack of any substantially changed circumstances affecting the property between the two votes. Appellants further explain that Reg. Section 98 Subsection B does not apply, as no new Permit application was filed in the few intervening minutes of discussion.

13

"If the [Commission] determines there is substantial credible evidence supporting the application [it] shall make a motion to approve the application and determine what conditions are necessary." Reg. Section 95(A). The Regulations empower the Commission to freely debate and vote on the recommended conditions. See Reg. Section 96(F) ("A vote may be taken on proposed conditions before consideration of whether the permit should be denied[.]"). Here, the Review Committee presented the Commission with eleven recommended conditions on the Permit. Rather than voting on each of the eleven conditions separately, a commissioner moved for consensus on approving the Permit with the first eight conditions. Detailed debate of the three disputed conditions continued until the Commission reached agreement by voting on nine of the eleven recommended conditions—incorporating Condition No. 9 and omitting the conditions restricting retail sales and restricting operation in winter months. While the Commissioners cast two votes on the same Permit application, the two votes addressed different sets of conditions and thus were not identical votes. A true reconsideration vote would have occurred had the Commissioners voted on the same application *with the same conditions*. Appellants' argument that the second vote was a prohibited vote for reconsideration under Reg. Section 98 is unavailing because the set of conditions presented with each vote were not identical and contained substantive differences. The Commissions' second vote was not a merely procedural matter. The inclusion of Condition No. 9 stipulated that only trucks from MAI or Havin could haul materials to and from the site. This condition addressed the roadway concerns expressed by Commission members. The Commission also recognized that Condition No. 9 impacted another proposed condition barring retail sales from the site, because MAI would be required to haul the aggregate to the buyers. Thus, while Appellants suggest the Commissions' second vote was a vote of reconsideration to which MAI was not entitled, we are not persuaded

14

Appellants properly characterize the record. The motions calling for a vote to approve the Permit application were not made in isolation. Rather, the separate votes were requested on the Permit application having substantively different conditions.

We will not speculate as to whether and how the discussion on conditions on the Permit application would have ended if the vote to approve the Permit with eight conditions had passed. We recognize that framing the initial motion as a vote to approve the Permit with eight conditions, as opposed to first conducting a separate vote on which conditions would be applied to the Permit, introduces unnecessary confusion to the process. Nevertheless, we are not persuaded the Commission violated the Regulations. The unbroken discourse among the Commission members concerned the array of recommended conditions over which the Commission exercises complete discretion.[6]

The Commission operates under a regulatory framework that presumes the approval of a Permit unless the Commission lacks jurisdiction, the application is incomplete, or the application is noncompliant with the Regulations. See Reg. Section 91. Nonetheless, the Commission may still deny the application if it finds clear and convincing evidence that the application fails the three jurisdictional requirements relating to health and safety, property use and value, and compatibility with the plan for the area. See id. The Regulations provide that the Commission *shall* approve the Permit if the jurisdictional requirements are met, while additional conditions consistent with the jurisdictional requirements *may* be imposed by the Commission when approving the Permit application. See Reg. Sections 91, 96. Therefore, because the Commission

---

[6] We also note that the Reg. Section 98 refers to the following: reconsideration "at a later time;" the opportunity for a Permit applicant to bring up new circumstances since the prior vote or new information since "a previous hearing;" and the opportunity for a Permit applicant to refile its application if something changed but needing to adhere to the original appeal deadline. These temporal cues signal the passage of time following a break in the Permit application process and a reconsideration of a final decision—hence the proscription against deadline extensions for appeal. Here, however, there was no break in the permitting process to suggest a reconsideration as contemplated by Reg. Section 98.

15

did not violate the express language or spirit of Reg. Section 98 concerning reconsideration, the Commission's Permit approval was not invalid under the Regulations. Under the record before us, Reg. Section 98 does not serve as a basis for finding that Board's approval of the Permit was unauthorized by law. See Martin Marietta Mats., Inc., 246 S.W.3d at 11.

Additionally, even if we were to find that the Commission's vote to approve the Permit with Condition Nos. 1–9 was an improper reconsideration of the failed vote to approve the Permit with Condition Nos. 1–8, Reg. Section 98 does not expressly state that an improper reconsideration by the Commission invalidates any subsequent Permit approval. Appellants identify no section in the Regulations providing a mechanism to invalidate the second vote. We note that while the Regulations allow the Commission to revoke an approved Permit in the event of a violation of the regulatory provisions or conditions, such revocation authority is purely discretionary and does not mandate the Commission revoke an approved Permit. See Reg. Section 99(A) (providing a Permit "*may* be revoked by the [Commission.]") (emphasis added). In their argument, Appellants cite no regulation or law stating that a violation of Reg. Section 98 results in automatic denial or revocation of a Permit application. Likewise, Appellants proffer no regulation addressing the validity or invalidity of a Permit application that was improperly reconsidered under Section 98(A). Rather, Appellants advance an argument based not in law but in policy—that the Board should deny approval of a Permit that was improperly reconsidered by the Commission in violation of Reg. Section 98(A). See Jackson, 300 S.W.3d at 535, 538 (rejecting a policy argument against a zoning council's approval of a special use permit, having found "no merit to [the] [a]ppellants' claim that the [c]ouncil was without 'jurisdiction' to grant the special use permit because the [c]ity failed to follow its own procedures."). Appellants fail to satisfy their burden of showing that the agency decision was

16

illegal in the sense of being unauthorized by law.  See id. at 536; Martin Marietta Mats., Inc., 246 S.W.3d at 11.

Appellants attempt to bridge the gap in legal reasoning by relying on F.W. Disposal S., LLC v. St. Louis Cty., 168 S.W.3d 607 (Mo. App. E.D. 2005) and State ex rel. Mason v. Cty. Comm'n of Franklin Cty., 551 S.W.3d 54 (Mo. App. E.D. 2018).  Both cases are distinguishable as they each involve challenges to zoning amendments, which receive enhanced scrutiny of procedural safeguards because "[t]he exercise of zoning power is a legislative [act]" and thus may be reversed "only if it is arbitrary and unreasonable, meaning that the decision is not 'fairly debatable.'"  Windy Point Partners, L.L.C. v. Boone Cty. ex rel. Boone Cty. Comm'n, 100 S.W.3d 821, 824 (Mo. App. W.D. 2003) (internal quotation omitted) (explaining the different standards of review for Permit appeals and rezoning appeals); see also Mason, 551 S.W.3d at 57 (internal citation omitted); F.W. Disposal S., 168 S.W.3d at 612, 615 n.4.  Mason also included a procedural due-process complaint.  551 S.W.3d at 54, 57.  In that case, the appellants had been denied the opportunity to be heard at a hearing to which they were entitled by both statute and local regulation.  Further, the regulation specified the mechanism to void the decision by stipulating that no order or recommendation could be adopted without a public hearing.  Id. at 58–59.  In contrast, no regulation or statute here provides that any voting issue results in an invalid decision.  Moreover, unlike the issue of being denied an opportunity to speak at a hearing in Mason, we find no violation of Applicants' procedural due-process rights because, as will be discussed in the following section, Appellants attended all hearings and meetings and were not denied any opportunity to challenge the Permit or agency proceedings.  See Jackson, 300 S.W.3d at 536–37 (discussing rejections of due-process challenges where the appellants did not timely complain of lack of notice and in fact attended and were heard at the relevant hearings).

17

B.	Robert's Rules do not invalidate Board's Permit approval

Appellants next contend that the Board's approval was invalid because the Commission did not follow Robert's Rules. Preliminarily, we note that Appellants have not properly preserved this claim. Appellants do not raise any issue relating to Robert's Rules in their Point Relied On, which generally identifies only the Regulations as the source of voting irregularity. See Rule 84.04(d); Jackson, 300 S.W.3d at 534 (internal citation omitted) (noting that arguments not included in a Point Relied On are not preserved for review). However, because this Court prefers to rule on the merits of arguments, and because Appellants develop the Robert's-Rules-claim in the argument portion of their brief, we exercise our discretion to review the claim. See Jackson, 300 S.W.3d at 535.

At the time of the relevant meeting and vote, the Commission followed Robert's Rules, which provide that "[o]n a tie vote, a motion requiring a majority vote for adoption is lost, since a tie is not a majority." Robert's Rules Section 44, at 405.[7] Robert's Rules also state that a motion may be made to reconsider a motion on which a vote was already taken. Robert's Rules Section 37, at 315. As Appellants submit, the record shows that no motion was made to reconsider the tie vote on approving the Permit with eight conditions, which resulted in denial. See Robert's Rules Sections 37, 44. Rather, as explained in the preceding section, there was no improper reconsideration of the same vote—that of approving the Permit with eight conditions. Instead, after further debate, a new motion was made to approve the Permit containing substantively different conditions. As reasoned above, we are not persuaded by Appellants' characterization that the second vote on the new motion constituted a reconsideration of substantially the same motion. Appellants rely upon cases from other jurisdictions applying

---

[7] All Robert's Rules Section references are to Henry M. Robert III, et al., Robert's Rules of Order Newly Revised (11th ed. 2011).

18

Robert's Rules that are, at most, persuasive authority and feature blatant procedural impropriety. See Wolfman, Inc. v. City of New Orleans, 874 So.2d 261, 264–65 (La. App. 4th Cir. 2004) (entertaining a motion to reconsider filed approximately one month out of time); El Dorado Amusement Co., Inc. v. City of San Antonio, No. 1999-CI-10651, 2004 WL 3323696, at *1–*2 (Tex. Dist. Aug. 18, 2004) (adjusting the voting panel after a failed vote by bringing in another member to secure a passing vote on the same measure). These cases provide no guidance that the Board lacked authority to approve the Permit under Robert's Rules.

However, to the extent the Commission may have failed to precisely follow Robert's Rules, MAI posits that Appellants waived their claim because no point of order was raised at the Commission meeting to enable the Commission to correct such failure. Just as Robert's Rules require a motion to reconsider before revoting on the same motion, Robert's Rules also require a point of order be made in the event of a perceived rule violation, in which case the chair must call for a ruling and enforce the regular rules. Robert's Rules Section 23, at 247–251. Further, "[i]f a question or order is to be raised, it must be raised promptly at the time the breach occurs." Id. Robert's Rules offer an example that if a chair is stating the question on a motion that has not been seconded, or on a motion that is out of order in the existing parliamentary situation, then "the time to raise these points of order is when the chair states the motion. After debate on such a motion has begun—no matter how clearly out of order the motion may be—a point of order is too late." Id. Thus, unless an exception applies to constitute a continuing breach, "[p]oints of order regarding the conduct of a vote must be raised immediately following the announcement of the voting result." Id.

In this case, Appellants first raised the alleged voting impropriety in their appeal to the Board. Appellants were present at the meeting of the Commission but did not interject a point of

19

order when the alleged voting error occurred. More importantly, no commissioner raised a point of order when the motion was made to vote on the approval of the Permit with Condition Nos. 1–9. Thus, if the motion to vote on the Permit with Condition Nos. 1–9 was indeed out of order, then the time to identify and correct the error was when the Chairman made the motion to vote to approve the Permit with Condition Nos. 1–9, or immediately following the vote. Robert's Rules Section 23, at 247–251. Appellants did not raise the issue before the Commission but instead only raised the issue at a later date before a different body—the Board, whose procedure is not governed by Robert's Rules. Appellants suggest that they had no standing to raise a point of order as they were not members of the Commission but only observers of the public meeting. But the undeniable fact remains that no timely point of order was made to preserve a claim based on an alleged irregularity under Robert's Rules.

We are guided in our analysis by Missouri law, which similarly recognizes the conceptual framework of promptly addressing alleged errors of an administrative agency. Under Missouri law, a reviewing court may refuse to consider a claim of alleged error by an administrative agency when the aggrieved party fails to raise the objection before that agency. See Ogden, 872 S.W.2d at 614 (internal quotation omitted) (declining to hear those claims not raised before the administrative agency because "[a]n issue which has not been presented for determination at the administrative hearing is not preserved for appellate review, for a court will not set aside an administrative action unless the agency has been given a prior opportunity to consider the point"). Thus, to the extent that we are asked to review the voting procedure of the Commission when considering the Board's authority to approve the Permit, Appellants' claim based on a violation of Robert's Rules is not preserved. See id. Thus, because Robert's Rules do not allow

20

for an untimely point of order not raised before the Commission, Appellants cannot rely on Robert's Rules to justify overturning the Board's decision.

Therefore, considering both Appellants' arguments under the Regulations and Robert's Rules, we find the Board's approval of the Permit was legal because the Board's action was authorized by law. See Martin Marietta Mats., Inc., 246 S.W.3d at 11. Point One is denied.

## II.    Point Two—Substantial Evidence Supporting Permit Approval

In Point Two, Appellants maintain that the Board's decision to approve the Permit was not supported by substantial evidence and was against the weight of the evidence.

As set forth in the standard of review section, "[a]n agency's decision is unsupported by competent and substantial evidence only in the rare case when the decision is contrary to the overwhelming weight of the evidence." Miller v. Dunn, 184 S.W.3d 122, 124 (Mo. App. E.D. 2006) (internal citation omitted). We examine whether the agency decision was "arbitrary, capricious or unreasonable, or involve[d] an abuse of discretion." Windy Point, 100 S.W.3d at 824; see also Karsch, 302 S.W.3d at 756 (internal citations omitted). We must defer to the Board's view of the evidence and reasonable inferences therefrom. See Karsch, 302 S.W.3d at 756 (internal citations omitted). "If the evidence would support either of two different, opposed findings, this Court is bound by the determination of [zoning board,]" as we may not substitute our own judgment for that of the Board. Id. (internal citations omitted). We also defer to the Board's view of the credibility of witness testimony. Id. at 762 (citing Windy Point, 100 S.W.3d at 826); Kramer v. Mason, 806 S.W.2d 131, 134 (Mo. App. E.D. 1991).

As described in Point One, the Board reviewed the Commission proceedings. The Regulations provide that the Commission shall approve a Permit application unless the Commission lacks jurisdiction, the application is incomplete, or the Permit will not comply with the Regulations. Reg. Section 91(A–B). The Commission may nonetheless deny the Permit "if

21

it concludes, based upon clear and convincing evidence submitted at the hearing" that there is a problem with the following jurisdictional requirements:

1.  The use will be significantly detrimental to public health, safety, morals, or general welfare.
2.  The use will cause serious injury to neighboring property use or values.
3.  The use will not be compatible with the plan for the area in question and will [not] comply with all applicable zoning standards and regulations.

Reg. Section 91(C).

Appellants do not directly refer to Reg. Section 91 in their Point Relied On.  See Rule 84.04(d) (requiring a Point Relied On to identify the relevant legal authority); Jackson, 300 S.W.3d at 534 (internal citation omitted) (noting that arguments not included in a Point Relied On are not preserved for review).  However, Appellants address Reg. Section 91's jurisdictional requirements by arguing that approving the Permit was not supported by substantial evidence and was against the overwhelming weight of the evidence in that the record establishes that MAI's gravel operation: (i) would materially endanger and/or be significantly detrimental to the public health and safety due to dangerous driving conditions and deterioration of roadways, (ii) would substantially injure or cause serious injury to the value of adjoining, abutting or neighboring property, and (iii) was not in harmony with the area, would not be in conformity with the County master plan, and was not compatible with the plan for the area.  Although Appellants' Point Relied On does not explain why MAI's gravel operation as approved in the Permit with nine conditions would fail those requirements, Appellants expound on their reasoning in the argument portion of the brief.  For this reason, we gratuitously exercise our discretion to review the point on its merits.  See Rule 84.04(d) (requiring a point relied on to explain the legal reasoning supporting the claim of error); Jackson, 300 S.W.3d at 535 (internal citation omitted) (noting that where "we are able to discern the basis for the claim of error, and

22

the defective nature of the point relied on does not impede our disposition of the case, we will consider the merits of [the] [a]ppellants' allegation").

Here, the Commission did not find clear and convincing evidence that the Permit application failed to meet the Reg. Section 91 jurisdictional requirements. Upon upholding the Commission's Permit approval, the Board found that Appellants did not meet their burden of persuasion to overturn the approval based on the jurisdictional requirements regarding the adequacy of the roadways and the impact on neighboring property values, among other concerns. We consider each jurisdictional requirement as follows.

A.     No finding of significant detriment to public health or safety

Appellants' first challenge to the Permit approval focuses on the impact of the gravel-mining operation on public health and safety. Appellants maintain the record lacks substantial evidence that the planned gravel-mining operation with associated dump trucks on the roadways would not materially endanger public health and safety under the first jurisdictional requirement of Reg. Section 91. We disagree.

The evidence in the record before the Board addressed sound and air emissions, visibility, traffic, and property values, among other factors. For this first jurisdictional requirement, Appellants primarily focus on traffic safety conditions and roadway deterioration. Viewed in the light most favorable to the agency decision, the evidence reasonably supports the Board's finding of no clear and convincing evidence of a significant detriment to health and safety arising from the sound, visibility, or public highway traffic from the proposed site. The Board considered the additional traffic that MAI's new operation would add to Highway TT and Mill Hill Road. The Board found that the new site, surrounded by low-density residential and undeveloped land, did not present a significant detriment to public health or safety. The truck traffic was projected to

23

gradually increase, at most, to seventy trips per day on weekdays and up to twelve Saturdays, over a period of approximately thirty years. The present truck-traffic projection was eighteen trips per day. The addition of Condition No. 9 was designed to limit retail traffic that might otherwise be generated by the gravel operation.

The Commission and the Board were presented with evidence in the record of the condition of Mill Hill Road and Highway TT. In particular, a request was made for MoDot to investigate the condition of Highway TT in the area. MoDot found that maintenance work was needed and proposed several solutions, but indicated limited funding would direct which option would be implemented. Additionally, an accident report showed three fatal accidents on Mill Hill Road since 2010 and 133 accidents on Highway TT between 2006 and 2017. County residents also testified to the deterioration of the roadway and expressed concerns about increased traffic, especially along a stretch of roadway referred to as "dead-man's curve." See Windy Point, 100 S.W.3d at 824 (noting in a case affirming a county's denial of a Permit that the zoning board could rely on lay testimony about road congestion). While Appellants contend that such data demonstrated clear and convincing evidence of a significant safety concern, both the Commission and the Board disagreed, finding the regulatory and conditional requirements of the Permit approval adequately protected public health. The Board considered MAI's point that MoDot never stated that it would not repair Highway TT, but only that MoDot presently had insufficient funds to add a shoulder, resurface, or make the necessary repairs in the preferred way. The record also shows that the Commission noted that no culverts or bridges on any of the routes were substandard such that they would fail the highway requirements. The Board also heard that the truck entrances onto Mill Hill Road would have to comply with the County regulations for commercial entrances. Further, the Board discussed how Condition 9 mitigates

24

the most serious traffic safety concerns by limiting the increased truck volume to drivers already familiar with the area and overseen directly by MAI and Havin. For instance, MAI's proposed truck route does not travel the dead-man's curve, and the imposition of Condition 9 allowed the highway administrator to control the traffic patterns. Norman had testified that his concerns related to passing traffic on the dead-man's curve was attributed to the *uncontrolled* truck that could be generated should the site be opened for retail sales. Upon review of all the evidence presented, the Board did not find rejecting the Permit was necessary to protect public safety merely due to increased traffic and the need for roadwork by MoDot. When the evidence may support either of two different, opposed findings, we are bound by the Board's view of the record and will not reweigh the evidence. See Karsch, 302 S.W.3d at 756 (internal citations omitted); see also Greene Cty. Concerned Citizens v. Bd. of Zoning Adjustment of Greene Cty., 873 S.W.2d 246, 257–58 (Mo. App. S.D. 1994) (rejecting invitation to reweigh the evidence posed by the appellants' detailed recitation of how the conditions imposed on the approved permit— including but not limited to conditions for hours of operation, design of buildings, odor dilution ratio, and sound proofing—would inadequately control noise, odor, and traffic).

The record reflects that the Board carefully considered the potential impact of the gravel operation on the area roadways with respect to health and safety of the county residents. We are not persuaded that the Board acted in a manner that was "arbitrary, capricious or unreasonable, or involve[d] an abuse of discretion." Windy Point, 100 S.W.3d at 824. Indeed, the Board debated at length the final three conditions involving traffic related to retail sales, winter months, and third-party drivers. The Board approved the Permit with Condition 9, limiting hauling to only those trucks owned or operated by MAI or Havin, demonstrating the Board's intent to ensure roadway safety by minimizing the presence of unknown, third-party drivers.

Adhering to our deferential standard of review, we are unwilling to hold that Board erred in finding Appellants failed to meet their burden of demonstrating clear and convincing evidence of material endangering of public health or safety to justify denying the Permit. See Karsch, 302 S.W.3d at 756.

B.    No finding of serious injury to neighboring property use or value

The Board also determined that Appellants did not adduce clear and convincing evidence that granting the Permit would cause serious injury to neighboring property value or use under the second jurisdictional requirement of Reg. Section 91.

Viewed in the light most favorable to the agency decision, the proposed gravel-mining site consists of fifty-four acres of land near the Meramec River. The property at issue is mainly surrounded by low-density residential and undeveloped floodplains. MAI's activities involve using an excavator to scoop gravel and sand into dump trucks, which then haul the load from the Meramec River along Mill Hill Road and Highway TT. MAI's site plans and activities are subject to numerous compliance requirements from various organizations, including but not limited to the County, MoDot, the Mine Safety and Health Administration, the Army Corps of Engineers, and the Missouri DNR. MAI's site plan includes a one-hundred-foot buffer around the site, which also is surrounded by trees and hills providing visual blockage of the operations. At the end of the operations, the mining pit will be converted into a twenty-five-acre lake. The nearest residence is located 480 feet away from the site. The next closest residence is located at least 850 feet away. Hootie's is located 670 feet away with its nearest building at 1800 feet away. MAI submitted data on projected sound impacts on neighboring residents and persons engaging in recreational activities at Meramec River. The record contains evidence that the sound generated by the gravel operations will be diminished due to distance, indirect paths, and

26

limited high-decibel sounds from work-day mining, which will not occur on weekends, holidays, or evenings when recreational activities are most common. Regarding specific property valuations, the record contains two examples of prior property sales near one of MAI's other mining sites. Neither sale demonstrated a decrease in property value, although the Board acknowledged that the sales were not recent. Local property owners expressed in writing their concerns about lower property values should the Permit be approved, and Appellants submitted excerpts from two scholarly studies discussing the negative impact of mining operations on property values.

Considering the full record before the Board, we do not reweigh the evidence but must defer to the Board's judgment on the credibility and weight accorded to the evidence. See Karsch, 302 S.W.3d at 762 (citing Windy Point, 100 S.W.3d at 826); Kramer, 806 S.W.2d at 134. The evidence reasonably supports the Board's decision given the remoteness of the site, its highly regulated nature, the conditions accounting for recreational enjoyment of the Meramec River by residents, and the speculative evidence relating to anticipated property values. The Board was not persuaded that clear and convincing evidence existed to support Appellants' claim that serious injury to property values or use would result from approving the Permit. See Karsch, 302 S.W.3d at 756. We may not substitute our judgment for that of the Board. See id. (internal citations omitted). Accordingly, the Board's finding that the proposed gravel operations would not seriously injure nearby property value or use does not lack substantial evidence nor is it against the overwhelming weight of the evidence. See id.

C. No finding of incompatibility with the plan for the area

Lastly, we examine the Board's determination that Appellants did not show clear and convincing evidence that the gravel-mining operation would fail to conform with the County

master plan or exist in harmony with the area pursuant to the second jurisdictional requirement of Reg. Section 91.

Reg. Section 135 under Article 7 of the Regulations governs non-urban and agricultural zoning districts in the County, such as the site for the gravel-mining operation at issue in the Permit. The purpose of such zoning districts is "to allow agricultural, recreational, wildlife, forestry, open space, farming and related uses to mix with low-density residential development." Reg. Section 135(A). Reg. Section 135(C)(6) specifically allows a gravel-mining operation as compatible with the master plan by providing for the conditional use of "[e]xtraction, quarrying, or mining of sand, gravel, top soil, or other materials." Because the Regulations specifically contemplate the activities in MAI's Permit, the record supports a finding that the Permit conforms to the master plan. See, e.g., Greene Cty. Concerned Citizens, 873 S.W.2d at 255, 257 (noting a zoning board may grant a permit for a conditional use that is allowed for by the county regulations and further that the zoning board's interpretation of the county regulations is given great weight). We then review the evidence relating to the co-existence of the proposed gravel-mining operation with the surrounding area. The Board's finding that the proposed gravel-mining operation could exist in harmony with the surrounding area is supported by evidence that MAI has other similar existing sites and has been mining material from the Meramec River for many years as the sole supplier of this type of aggregate in the County. The site has limited hours of operations, ending at 3:30 p.m. on weekdays and noon on twelve Saturdays a year, minimizing the overlap with recreational activities. The Board imposed conditions on the Permit that further sought to harmonize the operation with the surrounding environment, including requiring floodplain-building compliance, a no-rise engineering certificate, approval by the County Building Department, compliance with requirements of the DNR and Army Corps of

28

Engineers, as well Condition No. 9 limiting the hauling of material from the site. After approximately thirty years of operation, the site will be left as a lake surrounded by trees with low visibility and low sound impact on neighboring properties. The record supports our holding that the Board did not act capriciously or go against the overwhelming weight of the evidence in finding the Permit to be in harmony with the area and in general conformity with the County master plan. See Karsch, 302 S.W.3d at 756; Windy Point, 100 S.W.3d at 824.

D.      Summary

Having considered each of the three jurisdictional requirements of Reg. Section 91, we do not find Board's decision to approve the Permit was unsupported by substantial evidence or against the overwhelming weight of the evidence. See Karsch, 302 S.W.3d at 756. Point Two is denied.

In conclusion, the Board's decision was authorized by law, and the Permit approval was supported by substantial evidence in the record. See Martin Marietta Mats., Inc., 246 S.W.3d at 11. Accordingly, we affirm the Board's decision and uphold the judgment of the circuit court.

### Conclusion

The judgment of the circuit court is affirmed.

KURT S. ODENWALD, Judge

Philip M. Hess, P.J., concurs.
Lisa P. Page, J., concurs.

29